**KLESTADT WINTERS JURELLER**
  **SOUTHARD & STEVENS, LLP**
200 West 41st St., 17th Floor
New York, NY 10036
Telephone: (212) 972-3000
Facsimile: (212) 972-2245
Tracy L. Klestadt
Maeghan J. McLoughlin

*Counsel to the Debtor and Debtor in Possession*

**Hearing Date: January 6, 2016**
**Hearing Time: 1:30 p.m.**

**Objection Deadline:**
**December 30, 2015**

**Competing Offer Deadline:**
**December 30, 2015**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
In re                                                    :          Chapter 11
                                                         :
ROXANNE GAIL CARFORA, D.O., P.C. d/b/a                    :          Case No. 15-74328
AGELESS 360 MEDICAL GROUP, P.C.                           :
                                                         :
                                   Debtor.                :
-------------------------------------------------------------------x

**MOTION FOR AN ORDER PURSUANT TO SECTIONS 105(A), 363, AND 365 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 2002, 6004, AND 6006: (I) APPROVING THE ASSET PURCHASE AGREEMENT SUBJECT TO HIGHER AND BETTER OFFERS, AND (II)(A) APPROVING THE SALE OF CERTAIN ASSETS OF THE DEBTOR FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES, (B) AUTHORIZING THE REJECTION OF CERTAIN UNEXPIRED LEASES AND EXECUTORY CONTRACTS, AND (C) GRANTING RELATED RELIEF**

Roxanne G. Carfora, D.O., P.C. d/b/a Ageless 360 Medical Group, the above-captioned

debtor and debtor in possession (the "Debtor"), by its attorneys, Klestadt Winters Jureller

Southard & Stevens, LLP, hereby moves (the "Sale Motion") for entry of an order (I) Approving

The Asset Purchase Agreement Subject To Higher And Better Offers, And (II)(A) Approving

The Sale Of Certain Assets Of The Debtor Free And Clear Of Liens, Claims, And

Encumbrances, (B) Authorizing The Rejection Of Certain Unexpired Leases And Executory

Contracts, And (C) Granting Related Relief (the "Sale Order"), substantially in the form annexed

hereto as **Exhibit A**.  In support of the Sale Motion, the Debtor respectfully represents and alleges as follows:

**JURISDICTION AND VENUE**

1.        This Court has jurisdiction over this Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue of this case is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

2.        The statutory predicates for the relief sought herein are sections 105, 363 and 365 of Title 11, United States Code (the "Bankruptcy Code") and rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

**BACKGROUND**

A.  **Nature of the Debtor's Business**

3.        The Debtor is a medical group formed by its President Dr. Roxanne G. Carfora in 1997 which prides itself on "Getting You Healthy, Naturally."™

4.        The Debtor was developed by Dr. Carfora to combine the three specialties of Functional Medicine, Anti-Aging Medicine, and Family Medicine. The Debtor's physicians are trained to practice medicine by looking at the cause of disease and detecting underlying deficiencies.   Dr. Roxanne Carfora is the Debtor's sole owner and has been a practicing physician for over twenty-five (25) years.   Dr. Carfora completed a fellowship in Anti-aging/Functional Medicine which teaches doctors to prevent disease by correcting the underlying vitamin, hormonal, and nutritional depletions.

5.        The Debtor offers multiple specialties within its facilities along with state of the art equipment which allows the Debtor to offer an array of unique services.  The Debtor believes its true value is in the way it maintains patient's health and fights off the effects of aging naturally.

6.     The Debtor's specialties include functional and anti-aging medicine, advanced primary care, cardiovascular, hormone replacement therapy, nerve and brain function, comprehensive blood review, and allergy testing.  Each specialty offers state of the art and unique medical equipment to assess the cause of the patient's disease and prevent further illness in the future.

7.     The Debtor's office is located in Hauppauge, New York, and primarily serves patients from Suffolk and Nassau counties.

**B.  The Bankruptcy Case**

8.     On October 9, 2015 (the "Petition Date"), the Debtor commenced this chapter 11 case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

9.     The Debtor continues in possession of its property and continues to operate and manage its business as a debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

10.     The factual background regarding the Debtor, including its current and historical business operations and the events precipitating this chapter 11 filing, is set forth in detail in the *Affidavit of Dr. Roxanne G. Carfora, President and Sole Owner of The Debtor, Pursuant to Local Bankruptcy Rule 1007-4* (the "Carfora Affidavit") and is incorporated herein by reference.

11.     No trustee or committee has been appointed in these cases.

**C.  Marketing and Sale Process**

12.     Due to the uncertainties surrounding the Debtor's business, particularly the amounts owed to secured and unsecured creditors and ongoing litigation, and for other reasons consistent with the Debtor's duties to its creditors and other stakeholders, the Debtor concluded

that it is in the best interests of the Debtor, its creditors, and its estate to sell certain of the assets and/or the operations of the Debtor.

13.    On or around October 2015, Long Island Practice Management LLC (the "Purchaser") expressed an interest in acquiring the assets and operations of the Debtor. Thereafter, the parties began negotiating the terms of the Asset Purchase Agreement (the "APA"), which is annexed hereto as **Exhibit B**.

14.    The Purchaser is an affiliate of a medical practice and owns and operates several medical offices on Long Island that have a synergy with the primary care and functional medical care offered by the Debtor.

15.    The Purchaser evaluated the Debtor's high level of services and patient satisfaction as well as the Debtor's financial position and derived the price to purchase the assets of the Debtor.  The purchase price is $115,000 plus 72.5% of the accounts receivable collected by the Purchaser (the "Purchase Price").

16.    As an owner and operator of several medical practices in the same geographic region, the Purchaser is familiar with the fair market value of medical practices such as the Debtor's.  The Purchaser has purchased medical practices in the past and has determined that the Purchase Price represents the fair market value for a medical practice of the size and volume as the Debtor's.

17.    The Debtor believes that the Purchase Price, which includes payment of 72.5% of accounts receivable in addition to $115,000 in cash represents the highest and best price possible for its assets.

18.    As a result of the offer from the Purchaser and the Debtor's mounting financial difficulties, the Debtor has not done extensive marketing of its assets.  The Debtor intends to

publish notice of the Sale Transaction (defined below) in the Long Island Newsday to provide notice to interested parties.  In addition, the Debtor will send the notice annexed to this Sale Motion giving notice of the Sale Hearing, Competing Offer Deadline, and Objection Deadline (all as defined therein) (the "Sale Notice"), along with a copy of the Sale Motion to all creditors in order to ensure a fair marketing and sale process.

19.    This form of notice will ensure that potentially interested parties are informed of the Debtor's intent to sell its assets and are able to submit a competing offer.

## RELIEF REQUESTED

### A.    The Proposed Sale

20.    The APA sets forth the terms of the sale of certain of the Debtor's assets and business and related transactions, subject to higher and better offers, free and clear of liens, claims, interests and encumbrances (the "Sale Transaction").  The following is a summary of certain salient provisions of the APA and is qualified entirely by reference to the APA itself.[1]

(a)    Purchase Price.  In consideration for the Acquired Assets, the purchase price for the Acquired Assets is (a) $115,000 (the "Cash Purchase Price") and (b) 72.5% of the Accounts Receivable collected by Purchaser (the "A/R Purchase Price" together with the Cash Purchase Price, the "Purchase Price").

(b)    Purchased Assets.  Under the APA, the Debtor will transfer all right, title and interest in certain of its assets (described with more particularity in the APA as Acquired Assets), all leasehold improvements, non-movable equipment, furniture, fixtures and equipment, all inventory, supplies, and other articles of personal property (other than the personal effects of the Debtor's shareholder that are not related or used in connection with the Debtor's business); prepayments for future goods or services; all policies and procedures manuals and computer software (including but not limited to Electronic Medical Record (EMR) software); all telephone and facsimile numbers, emails, domain names, websites and all accounts on any third-party websites owned or used by the

---

[1] The following summary of the APA is provided for the convenience of the Court and the parties in interest.  A copy of the APA is attached hereto as **Exhibit B**.  To the extent that there are any discrepancies between this summary and the APA, the terms and language of the APA shall govern.  Unless defined herein, capitalized terms defined in the APA shall have the meanings ascribed to them therein.

Business (except the website www.drcarfora.com); EMR access and administrative codes; all patient lists and data; all employee and payroll records; goodwill and the assumed name "Ageless 360 Medical Group"; all Accounts Receivable related to goods or services rendered by the Business and existing on the date of the Closing; all transferable licenses and permits (if any); the security deposit being held by the Debtor's landlord; and exclusive access to patient records.

(c)     <u>Assumed Liabilities</u>.    Purchaser shall not assume any amounts due third party payors as a result of retroactive rate reductions, or any debt or liability relating to the ownership or operation of the Seller or the Acquired Assets.   The Debtor will reject its Contracts in accordance with the requirements of the applicable provisions of the Bankruptcy Code and subject to the procedures set forth in the Sale Order.   Seller is also rejecting its Real Property Lease and Purchaser and Landlord shall have executed a new lease for the Real Property with the effectiveness of such new lease conditioned on entry of the Sale Order.   Purchaser is not obligated to perform under the APA if a new lease has not been executed on or prior to the Closing Date.   Purchaser shall not be the successor to the Debtor and Debtor hereby acknowledges and agrees that, Purchaser is not assuming any liabilities or obligations of Debtor, whether known, unknown, contingent or otherwise.

(d)     <u>Representations and Warranties</u>.    The Debtor has represented and warranted that it is the title owner to the Acquired Assets, and, subject to approval by the Court, it has the requisite legal authority to sell such assets and business to Purchaser, and that all of the other representations and warranties provided under the APA are true and correct as detailed more fully in Article V of the APA.   Purchaser has represented and warranted that it is a corporation duly formed under the laws of the State of New York, and subject to satisfaction of the conditions and requirements under the APA, has the requisite power, authority, and financial capability to consummate the transactions contemplated hereunder, and that all of the other representations and warranties provided under the APA are true and correct as detailed more fully in Article VI of the APA.

(e)     <u>Termination Rights</u>.    The APA may be terminated by written notice promptly given to the other party at any time prior to the Closing Date by either party by mutual consent; if a permanent injunction or other order is entered that prevents the consummation of the transactions contemplated thereunder; by either Purchaser or Debtor, if the Closing has not occurred by the date which is ninety (90) days after the date of entry of the Sale Order or if the Bankruptcy Court authorizes or approves an Alternative Transaction or an Alternative Transaction is consummated; upon the voluntary or involuntary dismissal of the Bankruptcy Case; if there has been a material breach of any of the representations, warranties, covenant or other agreements set forth in the APA by either party which breach is not curable or is not cured within three (3) days of notice of such breach, and as more fully detailed in Article XI of the APA.

21.    The proposed sale provides for the continuation of business operations, preservation of attendant jobs to the extent employees of the Debtor become employees of the Purchaser, and maximization of value for the benefit of the Debtor, its creditors and the estate.

**B.    Extraordinary Provisions**

22.    In accordance with Administrative Order 557, In re: Adoption of Sale Guidelines, dated March 29, 2010 ("Administrative Order no. 557"), the Debtor discloses the following Extraordinary Provisions provided for in the APA:

(a)    Agreements with Management.  The Purchaser's obligation to consummate the Closing hereunder is contingent upon the Debtor's sole shareholder's (the "Owner") entry into the employment agreement substantially in the form annexed to the APA as Exhibit B.

(b)    Use of Proceeds.  The proposed form of Sale Order provides that: (i) the liens existing on the Acquired Assets will attach to the allocated net proceeds of the Sale to Purchaser to the same extent, validity and priority that existed prior to the Sale after taking into account the costs of the Sale, including payment of the Breakup Fee, if applicable; (ii) $52,500 of the Cash Purchase Price will be allocated to the Debtor's non-residential real property lease for its business premises, and the medical, office, and electronics equipment contained at the premises, (iii) $52,500 of the Cash Purchase Price will be allocated to the Debtor's remaining assets other than accounts receivable; (iv) $10,000 will be allocated to goodwill; and (v) the secured claim of 134 S. Central Ave. Corp. and the secured claim on Kirschenbaum & Kirschenbaum, P.C. on the Debtor's accounts receivable will attach to the proceeds of the A/R Purchase Price.

(c)    Record Retention: The Debtor is retaining ownership over its books and records, including patient records, but the Purchaser will have exclusive access to patient records, including the Debtor's electronic medical records.

(d)    Successor Liability: The proposed form of Sale Order contains findings and provisions limiting the Purchaser's successor liability.  The parties intend that the transfer of the Acquired Assets will not subject Purchaser to any liability other than any Assumed Liabilities.  The proposed finding in the Sale Order authorizing the Sale to be made free and clear of successor liability claims complies with applicable principles of sales conducted pursuant to Section 363(f) of the Bankruptcy Code and applicable non-bankruptcy law.

(e)    Relief from Bankruptcy Rule 6004(h): The proposed form of Sale Order contains a waiver of the stay imposed by Bankruptcy Rule 6004(h). The Debtor submits such relief is appropriate under the circumstances.

## HIGHER AND BETTER OFFERS AND BREAK UP FEE

23.    Consistent with the APA, the Purchaser has entered into the APA, which is subject to higher and better offers.  In that regard, Purchaser has expended considerable time, effort and resources conducting due diligence and negotiating the APA.

24.    The Debtor proposes that competing offers (each offer is a "Competing Offer") for the Acquired Assets be made by December 30, 2015, at 4:00 p.m. (the "Competing Offer Deadline").  If the Debtor receives a Competing Offer by the Competing Offer Deadline, the Debtor will request approval of the Bankruptcy Court to conduct an auction, or, alternatively, submit bidding procedures specifying the process for submitting bids and conducting an auction, subject to Bankruptcy Court approval.

25.    Competing Offers must (a) be in writing and (b) be received by Tracy L. Klestadt and Maeghan J. McLoughlin of Klestadt Winters Jureller Southard & Stevens, LLP, 200 W. 41st St., 17th Floor, New York, New York 10036 so that such bid is received no later than the Competing Offer Deadline.  Parties not submitting Competing Offers by the Competing Offer Deadline shall not be permitted to participate at any future auction or bidding process.

26.    In the event that the APA is terminated because the Court approves an Alternative Transaction and an Alternative Transaction is consummated or there has been a material breach by the Debtor in closing on the Asset Purchase Agreement as detailed in Article XI of the APA, Purchaser will be entitled to a fee of $15,000 (the "Break-Up Fee") to be paid from the first sale proceeds of an Alternate Transaction.  The Break-Up Fee is appropriate to compensate the Purchaser for its efforts in connection with it being the "stalking horse" offeror for the Acquired Assets, including the costs of the Purchaser incurred in performing due diligence, negotiating

and documenting the terms of the APA and representing its interests with respect to the proposed sale and the Debtor's bankruptcy case. The Break-Up Fee shall constitute a first priority administrative expense of the Debtor pursuant to Section 503(b) and shall be paid within seven (7) days of any closing in connection with the Acquired Assets and without further order or application to the Bankruptcy Court.

27.     The Debtor believes that the Break Up Fee is fair and reasonable (a) in view of the analysis and negotiation undertaken by the Purchaser in connection with the transaction contemplated by the APA and (b) because the efforts of the Purchaser have increased the chances that the Debtor will receive the highest or otherwise best offer for the Acquired Assets by serving as a catalyst for other potential or actual bidders. Thus, the Break-Up Fee benefits the Debtor, its estate, its creditors and all other parties in interest.

28.     The Purchaser is unwilling to commit to hold open its offer to purchase the Acquired Assets under the terms of the APA unless the Break-Up Fee is approved. Accordingly, the Debtor requests that the Court authorize payment of the Break-Up Fee pursuant to the terms and conditions of the APA.

## <u>REJECTION OF EXECUTORY CONTRACTS AND LEASES</u>

29.     In connection with the Sale Transaction, the Debtor seeks authority under section 365 of the Bankruptcy Code to reject its executory contracts (the "<u>Contracts</u>"), including its non-residential lease (the "<u>Real Property Lease</u>") together with the Contracts, the "<u>Rejected Contracts</u>") for the premises located at 694 Motor Parkway (the "<u>Real Property</u>").

30.     As of the closing date of the Sale Transaction (the "<u>Closing Date</u>") the Purchaser and the landlord (the "<u>Landlord</u>") for the Real Property shall have executed a new lease for the Real Property with the effectiveness of the new lease contingent on and subject to entry of the Sale Order.

31.     The Debtor is current on rental obligations under the Real Property lease as of the date of filing this Sale Motion.  Following rejection of the Real Property Lease, the Landlord will not hold a claim against the Debtor's estate on account of any unpaid obligations.

32.     In addition to the Real Property Lease, the Debtor is currently party to Contracts for its biohazardous waste management, copier machine, laser machine, certain medical equipment, and medical malpractice, disability, and workers' compensation insurance.

33.     As a result of the proposed Sale Transaction and sale of substantially all of the Debtor's assets, the Debtor will no longer be operating its business.  The Rejected Contracts are therefore no longer necessary or beneficial to the Debtor or its estate.  The Purchaser is an experienced and established medical practice and currently possesses its own equipment and machinery to run operations without the need for the Debtor's Rejected Contracts.  In addition, the Purchaser is already covered by all applicable insurance coverage, and the Debtor's Owner and any employees later hired by the Purchaser (if any) will be added to the Purchaser's insurance policies.

## NOTICE OF SALE

34.     Notice of the Sale Motion will be given to (i) the Office of the United States Trustee for the Eastern District of New York; (ii) the attorneys for the Purchaser; (iii) all counterparties to the Contracts; (iv) all known persons holding a lien on any of the Acquired Assets; (v) all known creditors and all known parties in interest in this chapter 11 case, and (vi) all parties filing a notice of appearance in this case.  The Sale Motion, along with all exhibits, will be given to all parties filing a notice of appearance in this case.

35.     In addition, the Debtor will publish notice of the Sale Transaction in the Long Island Newsday prior to the Competing Offer Deadline.

36.    The Debtor believes that the foregoing notice to the Notice Parties is sufficient to provide effective notice of the proposed Sale Transaction to potentially interested parties in a manner designed to maximize the chance of obtaining the broadest possible participation while minimizing the costs to the estate.   Accordingly, the Debtor requests that the Court find that notice in this manner is sufficient and that no further notice of the proposed Sale Transaction is required.

### BASIS FOR RELIEF REQUESTED

**A.    The Proposed Sale is Within the Debtor's Sound Business Judgment and Should Therefore Be Approved**

37.    The Debtor submits that ample authority exists for the approval of the Sale Transaction to the Purchaser pursuant to the APA, or to such other purchaser submitting a higher and better offer for the Acquired Assets.   Section 363(b) of the Bankruptcy Code permits a debtor to sell assets outside the ordinary course of its business.   That section provides in pertinent part, "[t]he trustee,[2] after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."   11 U.S.C. § 363(b).   While Section 363(b) does not provide any standards to be applied to a debtor's request to sell assets, a wide body of case law has evolved containing the judicial standards governing sales of assets.

38.    In In re Lionel Corp., 722 F.2d 1063 (2d Cir. 1983), one of the seminal and most widely followed cases dealing with asset sales, the Second Circuit determined that a sale of assets could be approved if the debtor could demonstrate an "articulated business justification" for the sale.   722 F.2d at 1070.   The Court further held that the factors to be considered in determining whether a sound business reason exists include the following:

---

[2] Pursuant to Section 1107(a) of the Bankruptcy Code, the debtor in possession has all of the powers of a trustee (except the power to investigate the debtor's own financial affairs).

the proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-à-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions and, most importantly perhaps, whether the asset is increasing or decreasing in value.

Id. at 1071.

39.    The Lionel decision has been widely accepted and applied by numerous other courts facing a debtor's request to sell assets, including requests to approve a sale of certain of the assets of a debtor's estate.  See, e.g., In re Fairfield Sentry Ltd., 539 B.R. 658, 668 (Bankr. S.D.N.Y. 2015); In re GSC, Inc., 453 B.R. 132, 155–56 (Bankr. S.D.N.Y. 2011); In re Innkeepers USA Trust, 448 B.R. 131, 146 (Bankr. S.D.N.Y. 2011); In re CPJK, LLC, 496 B.R. 290, 304 (Bankr. E.D.N.Y. 2011); In re Boston Generating, LLC, 440 B.R. 302, 321–22 (Bankr. S.D.N.Y. 2010).   As will be demonstrated below, application of the above-listed factors demonstrates that approval of the APA is warranted at this time.

40.    In addition to requiring sound business reasons to approve a sale pursuant to section 363(b) of the Bankruptcy Code, many courts have required a showing that the (i) proper notice has been given to all creditors and interested parties, (ii) the proposed sale price is fair and reasonable; and (iii) the purchaser is proceeding in good faith.   See, e.g., In re Boston Generating, LLC, 440 B.R. at 330; (citing In re General Motors Corp., 407 B.R. 463, 493–494 (Bankr. S.D.N.Y. 2009).

41.    The Debtor and Purchaser negotiated in good faith, at arms' length, and with a view towards maximizing the value of the Debtor's estate for all creditors, rather than to benefit insiders or a particular creditor.

42.    The Debtor is confident that the Purchase Price is the best achievable under the present circumstances.    Nonetheless, the APA is subject to higher and better offers, thereby ensuring that the best possible offer has been or will be received.

43.    Many courts require that fair and adequate notice be given of the proposed sale under section 363(b) of the Bankruptcy Code.    See, e.g., In re MF Global, 467 B.R. 726, 730 (Bankr. S.D.N.Y. 2012); In re Delaware & Hudson Ry., 124 B.R. 169, 176 (D. Del. 1991).    Fair and accurate notice should inform all interested parties of the liquidation of the debtor's business; disclose accurately the terms of the sale; explain the effect of the sale upon the debtor's business; and explain why the sale is in the best interests of the debtor's estate.    Delaware & Hudson, 124 B.R. at 180.

44.    The Debtor submits that the notice given here alerted parties in interest to the sale contemplated by the APA, described and explained all material terms thereof, and explained the effect of the sale on the Debtor's business.

**B.    The Purchaser is a Good Faith Purchaser and is Entitled to the Protections of Section 363(m) of the Bankruptcy Code**

45.    Section 363(m) of the Bankruptcy Code provides:    "The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal." 11 U.S.C. § 363(m); see also In re Motors Liquidation Co., 430 B.R. 65, 78 (S.D.N.Y. 2010) ("Section 363(m) limits the appealability of a Section 363 sale order that has been consummated to the issue of the purchaser's good faith").

46.     Although the Bankruptcy Code does not define "good faith," in In re Colony Hill Assocs., 111 F.3d 269 (2d Cir. 1997) the Second Circuit held that:

> The "good faith" component of the test under § 363(m) speaks to the equity of [the bidder's] conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

111 F.3d at 276 (internal citations omitted); In re GSC, Inc., 453 B.R. at 180 (citing Licensing by Paolo, Inc. v. Sinatra (In re Gucci), 126 F.3d 380 (2d Cir. 1997)) ("Good faith of a purchaser is shown by the integrity of his conduct during the course of the sale proceedings . . . and the relevant inquiry [remains] whether that conduct was intended to control the sale price or take unfair advantage of prospective bidders."

47.     As set forth above, the Purchaser was selected by the Debtor after engaging in extensive negotiations and determining that the terms of the Purchaser's bid were the most favorable option.  The APA is a product of extensive arms-length negotiations and was not in any way tainted by fraud, collusion or bad faith.  Accordingly, the Debtor requests that the Court make a finding that the Purchaser is entitled to the protections of section 363(m) of the Bankruptcy Code.

## C.     The Sale Satisfies the Requirements of Section 363(f) of the Bankruptcy Code for a Sale Free and Clear of Liens, Claims, Encumbrances and Interests

48.     The Debtor seeks authorization to sell the Acquired Assets to Purchaser free and clear of all liens, claims and encumbrances, except as expressly permitted by the APA.  Nonetheless, the Assets may be sold free and clear of liens in accordance with section 363(f) of the Bankruptcy Code, which provides, in pertinent part:

> (f)     The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if

(1) applicable non-bankruptcy law permits sale of such property free and clear of such interest;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4) such interest is in bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

49.     Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will be sufficient to permit the Sale Transaction free and clear of liens, claims, encumbrances, pledges, mortgages, security interests, charges, options, and other interests.  The Debtor submits that, the APA provides that all liens, to the extent that any such liens exist, will attach to the proceeds of sale in the order of their priority and to the extent of their validity.  As such, the rights of secured creditors are preserved.  Thus, the Acquired Assets may be sold free and clear of such liens pursuant to section 363(f)(3) of the Bankruptcy Code. See, e.g., In re Boston Generating, LLC, 440 B.R. at 331 (citing In re Beker Indus. Corp., 63 B.R. 474, 475–76 (Bankr. S.D.N.Y. 1986) ("the price must be equal to or greater than the aggregate *value* of the liens asserted against it, not their *amount*" and " 'value' of a lien is to be determined by reference to section 506(a)—that is, it is the amount by which the lienholder's claim is actually secured.") (emphasis in original);  In re Oneida Lake Development, Inc., 114 B.R. 352 (Bankr. N.D.N.Y. 1990).

**D.     The Court Should Waive or Reduce the Fourteen-Day Stay Periods Required by Rules 6004(g) and 6006(d) of the Federal Rules of Bankruptcy Procedure**

50.     Pursuant to Bankruptcy Rule 6004(g), unless the court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are

automatically stayed for 14 days after entry of the order.  Fed. R. Bankr. P. 6004(g).  The

purpose of Bankruptcy Rule 6004(g) is to provide sufficient time for an objecting party to appeal

before the order can be implemented.  <u>See</u> Advisory Committee Notes to Fed. R. Bankr. P.

6004(g).

51.    Although Bankruptcy Rule 6004(g) and the Advisory Committee Notes are silent

as to when a court should "order otherwise" and eliminate or reduce the 14-day stay period,

Collier suggested that the 14-day stay period should be eliminated to allow a sale or other

transaction to close immediately "where there has been no objection to the procedure."  10

COLLIER ON BANKRUPTCY 15th Ed. Rev., 6004.09 (L. King, 15th rev. ed. 2005).  Furthermore,

Collier provides that if an objection is filed and overruled, and the objecting party informs the

court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to

file such appeal.  <u>Id</u>.

52.    To preserve the value of the Acquired Assets and limit the costs of administering

and preserving the Acquired Assets, it is critical that the Debtor close the Sale Transaction as

soon as possible after all closing conditions have been met or waived.  Accordingly, the Debtor

hereby requests that the Court waive the 14-day stay periods under Bankruptcy Rules 6004(g)

and 6006(d), or in the alternative, if an objection to the sale or to the rejection of a contract or

lease is filed, reduce the stay period to the minimum amount of time needed by the objecting

party to file its appeal to allow the sale to close as provided under the APA.

**E.    The Rejection of the Rejected Contracts Should be Authorized**

53.    Section 365(a) of the Bankruptcy Code provides that a debtor in possession

"subject to the court's approval, may . . . reject any executory contract or unexpired lease of the

debtor." 11 U.S.C. § 365(a). "This provision allows a trustee to relieve the bankruptcy estate of

burdensome agreements which have not been completely performed." Stewart Title Guar. Co. v. Old Republic Nat'l Title Ins. Co., 83 F.3d 735, 741 (5th Cir. 1996) (citing In re Murexco Petroleum, Inc., 15 F.3d 60, 62 (5th Cir. 1994)).

54.    The Debtor's rejection of an executory contract or unexpired lease is governed by the "business judgment" standard. See In re Penn Traffic Co., 524 F.3d 373, 383 (2d Cir. 2008); In re Orion Pictures Corp., 4 F.3d 1095, 1098-99 (2d Cir. 1993); In re Enron Corp., Case No. 01-16034, 2006 WL 898033, at *4 (Bankr. S.D.N.Y. March 24, 2006) ("In determining whether to approve a [debtor's] decision to reject such lease or contract, a court applies the 'business judgment' test which is met if the rejection is beneficial to the estate."); In re Ames Dep't Stores, Inc., 306 B.R. 43, 51 (Bankr. S.D.N.Y. 2004); see also NLRB v. Bildisco & Bildisco, 465 U.S. 513, 523 (1984) (recognizing the "business judgment" standard used to approve rejection of executory contracts). The business judgment standard requires a court to approve a debtor's business decision unless that decision is the product of bad faith, whim or caprice. See Westbury Real Estate Ventures v. Bradlees, Inc. (In re Bradlees Stores, Inc.), 194 B.R. 555, 558 n.1 (Bankr. S.D.N.Y. 1996), appeal dismissed, 210 B.R. 506 (S.D.N.Y. 1997).

55.    Furthermore, rejection of an executory contract or an unexpired lease is appropriate where such rejection would benefit the estate. See Orion Pictures Corp., 4 F.3d at 1098-99; In re Stable Mews Assocs., Inc., 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984).  Upon finding that a debtor exercised its sound business judgment in determining that rejection of certain contracts or leases is in the best interests of its creditors and all parties in interest, a court should approve the rejection under section 365(a). See In re Summit Land Co., 13 B.R. 310, 315 (Bankr. D. Utah 1981) (holding that absent extraordinary circumstances, court approval of a

debtors' decision to assume or reject an executory contract "should be granted as a matter of course").

56.     As a result of the proposed Sale Transaction and sale of substantially all of the Debtor's assets, the Debtor will no longer be operating its business.  The Rejected Contracts are therefore no longer necessary or beneficial to the Debtor or its estate.  The Debtor requests that the Court establish the Closing Date as the effective date of the Debtor's rejection of the Rejected Contracts.  Accordingly, in an effort to reduce postpetition administrative costs and in the exercise of the Debtor's sound business judgment, the Debtor respectfully submits that the rejection of the Rejected Contracts is in the best interests of its estate and its creditors.

**F.    The Break-Up Fee is Warranted**

57.     To compensate the Purchaser for serving as a "stalking horse," thereby subjecting its bid to better or higher offers, the Debtor and the Purchaser seek authority for the Debtor to pay the Purchaser the Break-Up Fee if an Alternative Transaction is approved or consummated or there is a material breach by the Debtor preventing a Closing as provided in the APA.  The Debtor and the Purchaser believe that the Break-Up Fee is (a) fair and reasonable, given the benefits to the estate of having a definitive APA and the risk to the Purchaser that a third-party offer may ultimately be accepted and (b) necessary to preserve the value of the Debtor's estate.

58.     Bidding incentives such as the Break-Up Fee encourage a potential purchaser to invest the requisite time, money and effort to conduct due diligence and sale negotiations with a debtor despite the inherent risks and uncertainties of the chapter 11 process.  See e.g., In re 995 Fifth Ave. Assocs., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (finding bidding incentives may be "legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking") (citation omitted); In re Marrose Corp., 89 B 12171-12179 (CB), 1992 WL 33848, at *5 (Bankr. S.D.N.Y. 1992) (stating that "[a]greements

to provide breakup fees or reimbursement of fees and expenses are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers").

59.    The Debtor submits that the Break-Up Fee is a normal and necessary component of sales outside the ordinary course of business under section 363 of the Bankruptcy Code. <u>See e.g.</u>, <u>In re Metaldyne Corp.</u>, 409 B.R. 661, 669 (Bankr. S.D.N.Y. 2009) (approving break-up fee and finding that bidder protections such as break up fees are granted when a bidder provides a floor for bidding by expending resources to conduct the diligence and allowing its bid to be shopped around for a higher offer); <u>In re Ray Realty Fulton, Inc.</u>, 2009 WL 2600760, *1 (Bankr. E.D.N.Y. Aug. 21, 2009) (approving break-up fee because fee was reasonably related to risk, effort and expense of prospective purchaser); <u>In re Kmart</u>, Case No. 02 B02474 (SPS) (Bankr. N.D. Ill. May 10, 2002) (authorizing a termination fee and bid protections for potential bidders); <u>In re Comdisco, Inc.</u>, Case No. 01 24795 (RB) (Bankr. N.D. Ill. Aug. 9, 2002) (approving a termination fee as, *inter alia*, an actual and necessary cost and expense of preserving the debtor's estate, of substantial benefit to the debtor's estate, and a necessary inducement for, and a condition to, the proposed purchaser's entry into the Asset Purchase Agreement); <u>In re Integrated Resources, Inc.</u>, 147 B.R. at 660 (noting that break up fees may be legitimately necessary to convince a "white knight" to offer an initial bid by providing some form of compensation for the expenses such bidder incurs, and the risks such bidder faces by having its offer held open, subject to higher and better offers); <u>In re Crowthers McCall Pattern, Inc.</u>, 114 B.R. 877 (Bankr. S.D.N.Y. 1990) (approving an overbid requirement in an amount equal to the approved break up fee).

60.    The amount of the Break-Up Fee is reasonably calculated to compensate the Purchaser (a) for committing the time to perform due diligence, (b) for lost opportunity in being bound to a transaction that could be topped in a competitive auction process and (c) for serving as a "stalking horse" to encourage the submission of other bids.  In addition, the Purchaser is not an insider and negotiations for the APA and the Break-Up Fee were not tainted by self-dealing or manipulation.  Accordingly, the Debtor believes that the Break-Up Fee should be approved.

## NOTICE

61.    Notice of the Sale Motion will be given to (i) the Office of the United States Trustee for the Eastern District of New York; (ii) the attorneys for the Purchaser; (iii) all counterparties to the Contracts; (iv) all known persons holding a lien on any of the Acquired Assets; (v) all known creditors and all known parties in interest in this chapter 11 case, and (vi) all parties filing a notice of appearance in this case.  The Sale Motion, along with all exhibits, will be given to all parties filing a notice of appearance in this case.  The Debtor submits that such notice is sufficient and requests that this Court find that no other or further notice is necessary.

## NO PRIOR REQUEST

62.    No previous application for the relief requested herein has been made to this or any other court.

**WHEREFORE**, the Debtor respectfully requests that this Court enter the Sale Order substantially in the form annexed hereto, and grant such other relief as may be just and proper.

Dated:   New York, New York
       December 1, 2015

                     **KLESTADT WINTERS JURELLER
SOUTHARD & STEVENS, LLP**


By:   */s/ Tracy L. Klestadt*
        Tracy L. Klestadt
        Maeghan J. McLoughlin
        200 W. 41st St., 17th Floor
        New York, New York 10036
        Tel: (212) 972-3000
        Fax: (212) 972-2245
        Email: tklestadt@klestadt.com
              mmcloughlin@klestadt.com

        *Counsel to the Debtor*

**Exhibit A**

**Sale Order**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**
----------------------------------------------------------------x
In re                                                    :        Chapter 11
                                                         :
ROXANNE GAIL CARFORA, D.O., P.C. d/b/a                    :        Case No. 15-74328
AGELESS 360 MEDICAL GROUP, P.C.                           :
                                                         :
                                   Debtor.               :
----------------------------------------------------------------x

### ORDER AUTHORIZING AND APPROVING (I) THE ASSET PURCHASE AGREEMENT SUBJECT TO HIGHER AND BETTER OFFERS, AND (II)(A) APPROVING THE SALE OF CERTAIN ASSETS OF THE DEBTOR FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES, (B) AUTHORIZING THE REJECTION OF CERTAIN UNEXPIRED LEASES AND EXECUTORY CONTRACTS, AND (C) GRANTING RELATED RELIEF

Upon the motion (the "Sale Motion")[3] of the above-captioned debtor (the "Debtor"), pursuant to sections 105(a), 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code") and Federal Rules of Bankruptcy Procedure 2002, 6004, and 6006 (the "Bankruptcy Rules"), for entry of an order authorizing and approving, among other things, (I) Approving The Asset Purchase Agreement Subject To Higher And Better Offers, And (II)(A) Approving The Sale Of Certain Assets Of The Debtor Free And Clear Of Liens, Claims, And Encumbrances to Long Island Medical Practice LLC (the "Purchaser"), (B) Authorizing The Rejection Of Certain Unexpired Leases And Executory Contracts, And (C) Granting Related Relief; and it appearing that due and appropriate notice of the Sale Motion and the Sale Hearing having been given; and it appearing that no other notice of the relief granted by this Order need be given; and the Court having conducted a hearing on the Sale Motion on January 6, 2016 (the "Sale Hearing") at which time all interested parties were offered an opportunity to be heard with respect to the Sale Motion; and the Debtor having conducted a marketing process and published notice of the

---

[3] Capitalized terms not otherwise defined herein shall have the meanings given to them in the Motion or the APA.

-23-

proposed sale of its assets to Purchaser subject to higher and better offers (each offer a

"Competing Offer") made by December 30, 2015, at 4:00 p.m. (the "Competing Offer

Deadline"); and all objections to the Sale Motion made by December 30, 2015, at 4:00 (the

"Objection Deadline") having been overruled or withdrawn; and the Debtor having determined

that Purchaser has submitted the highest and best offer for the assets of the Debtor that Purchaser

has offered to purchase (the "Acquired Assets") as more specifically described in the Asset

Purchase Agreement (the "APA"); and all parties in interest having been heard, or having had the

opportunity to be heard, regarding entry of this Order and approval of the sale of substantially all

of the Debtor's assets to Purchaser and the rejection of certain contracts (the "Sale Transaction")

and APA; and this Court being fully advised; this Court, based upon the arguments, testimony

and evidence presented to it, hereby makes the following findings of fact and conclusions of law:

A.    This Court has jurisdiction to hear and determine the Sale Motion and to grant the

relief requested in the Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue of this case

and the Sale Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B.    This Order constitutes a final and appealable order within the meaning of 28

U.S.C. § 158(a).  To any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the

Federal Rules of Civil Procedure as made applicable by Bankruptcy Rule 7054, this Court

expressly finds that there is no just reason for delay in the implementation of this Order, and

expressly directs entry of judgment as set forth herein.

C.    This proceeding is a "core proceeding" within the meaning of

28 U.S.C. § 157(b)(2)(A), (N) and (O).

D.    The statutory predicates for the Sale Motion are sections 105, 363 and 365 of the

Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, and 9014.

E.      As evidenced by the affidavits of service filed with the Court, and based upon the representations of counsel at the Sale Hearing, (i) proper, timely and adequate notice of the Sale Motion, the Sale Hearing, the Sale Transaction, the Competing Offer Deadline, and Objection Deadline, as approved herein has been provided in accordance with Bankruptcy Rules 2002, 6004, 6006, and 9014, (ii) such notice was good, sufficient and appropriate under the circumstances and (iii) no other or further notice of the Sale Motion, the Sale Hearing, the Sale Transaction, the Competing Offer Deadline, or the Objection Deadline as provided herein is necessary or shall be required.

F.      A reasonable opportunity to object or be heard with respect to the Sale Motion and the Sale Transaction has been afforded to all interested persons and entities, including, without limitation: (i) the Office of the United States Trustee for the Eastern District of New York; (ii) the attorneys for the Purchaser; (iii) all counterparties to the Rejected Contracts; (iv) all known persons holding a lien on any of the Acquired Assets; (v) all known creditors and all known parties in interest in this chapter 11 case, and (vi) all parties filing a notice of appearance in this case.

G.      Notice, as specified in the preceding paragraph and as evidenced by the affidavits of service filed with the Court, has been provided in the form and manner specified in the Sale Motion and such notice is reasonable and adequate.

H.      The Sale Transaction was conducted in a non-collusive, fair and good faith manner and a reasonable opportunity has been given to any interested party to make a higher and better offer for the Acquired Assets.

I.     Purchaser is purchasing the Acquired Assets in good faith and is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code, and is therefore entitled to the protection of that provision.

J.     The APA was negotiated, proposed and entered into by the Debtor and Purchaser without collusion, in good faith and from arms'-length bargaining positions. Neither the Debtor nor Purchaser have engaged in any conduct that would cause or permit the Sale Transaction or any part of the transactions contemplated by the APA to be avoidable under section 363(n) of the Bankruptcy Code.

K.     As demonstrated by (i) the testimony and other evidence proffered or adduced at the Sale Hearing, and (ii) the representations of counsel made on the record at the Sale Hearing, the Debtor afforded interested potential purchasers a full and fair opportunity to submit a Competing Offer for the Acquired Assets.

L.     Purchaser is not an "insider" of any of the Debtor as that term is defined in section 101(31) of the Bankruptcy Code.

M.     The consideration provided by Purchaser for the Acquired Assets pursuant to the APA (i) is fair and reasonable, (ii) is the highest and best offer for the Acquired Assets, (iii) will provide a greater recovery for all of the Debtor's stakeholders than would be provided by any other practical available alternative and (iv) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Transfer Act and all other applicable laws.

N.     The Debtor has demonstrated a sufficient basis and compelling circumstances requiring the Debtor to enter into the APA and sell the Acquired Assets under section 363 of the

Bankruptcy Code, and such actions are appropriate exercises of the Debtor's business judgment and are in the best interests of the Debtor, the estate, and its creditors.

O.      The marketing process implemented by the Debtor and its advisors, as set forth in the Sale Motion, was fair, proper, and reasonably calculated to result in the best value received for the Acquired Assets.

P.      The Debtor has full authority and power to execute and deliver the APA and related agreements and all other documents contemplated by the APA, to perform its obligations therein and to consummate the Sale Transaction.  Except as set forth in the APA, no additional consents or approvals are necessary or required for the Debtor to enter into the APA, perform its obligations therein and consummate the Sale Transaction.

Q.      Purchaser would not have entered into the APA and would not consummate the Sale Transaction, thus adversely affecting the Debtor, the estate, and its creditors, if the Acquired Assets were not sold to it free and clear of all Claims and Encumbrances (defined below) or if Purchaser would, or in the future could, be liable for any Claims and Encumbrances against the Acquired Assets.

R.      Selling the Acquired Assets free and clear of any and all liens, claims (as defined in section 101(5) of the Bankruptcy Code), security interests, mortgages, encumbrances, obligations, including employee benefit obligations charges against or interests in property, adverse claims, claims of possession, rights of way, licenses, easements or restrictions of any kind, demands, guarantees, actions, suits, defenses, deposits, credits, allowances, options, rights, restrictions, limitations, contractual commitments, rights of first refusal, rights of setoff or recoupment, or interests of any kind or nature whether known or unknown, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or

unasserted, whether arising prior to or subsequent to the commencement of this chapter 11 case, whether imposed by agreement, understanding, law, equity or otherwise, subject to applicable law, including section 363 of the Bankruptcy Code (collectively, the "Claims and Encumbrances") would adversely impact the Debtor's estate, and the sale of the Acquired Assets other than as free and clear of all Claims and Encumbrances would be of substantially less value to the Debtor's estate.

S.      The provisions of section 363(f) of the Bankruptcy Code have been satisfied.  All holders of Claims and Encumbrances, if any, who did not object, or withdrew their objections to the Sale Transaction, are deemed to have consented to the Sale Transaction.

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED, EFFECTIVE IMMEDIATELY, AS FOLLOWS:**

1.      The relief requested in the Sale Motion is granted and approved in all respects, as set forth herein.  The Debtor's entry into the APA and the Sale Transaction is hereby approved in all respects.  Except as may be expressly provided herein, objections to the relief sought in the Sale Motion that have not been previously resolved or withdrawn are hereby overruled on their merits.

2.      The Debtor is authorized and directed to take any and all actions necessary or appropriate to (a) consummate the Sale Transaction in accordance with the Sale Motion, the APA and this Order, and (b) perform, consummate, implement and close fully the Sale Transaction, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the APA.

3.      Those holders of Claims and Encumbrances and other non-Debtor parties who did not object, or who withdrew their objections to entry of this Order, the Sale Motion, the Sale

Hearing, the Sale Transaction and the APA are deemed to have consented to this Order, the Sale Transaction and the APA pursuant to section 363(f)(2) of the Bankruptcy Code and are enjoined from taking any action against Purchaser, its successors, its assigns, its representatives, its affiliates, its properties, or any agent of the foregoing to recover any claim which such person or entity has against the Debtor or any of its affiliates or any of the Debtor's property. Those holders of Claims and Encumbrances and other non-Debtor parties who did object, if any, fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are adequately protected by having their Claims and Encumbrances, if any, attach to the proceeds of the Sale Transaction ultimately attributable to the property against or in which they assert a Claim or Encumbrance.

**Sale and Transfer of the Acquired Assets**

4.      Upon Closing, the Acquired Assets transferred, sold and delivered to Purchaser shall be free and clear of all Claims and Encumbrances of any person or entity. The transfer of the Acquired Assets to Purchaser constitutes a legal, valid and effective transfer of the Acquired Assets and shall vest Purchaser with all right, title and interest in and to the Acquired Assets.

5.      Upon closing of the Sale Transaction, this Order shall be construed as, and shall constitute for any and all purposes, a full and complete general assignment, conveyance and transfer of the Acquired Assets pursuant to the terms of the APA.

6.      Effective on the Closing, all entities, including, but not limited to, the Debtor, creditors, employees, former employees and shareholders, administrative agencies, tax and regulatory authorities, governmental departments, secretaries of state, federal, state and local officials, and their respective successors or assigns, including, but not limited to, persons asserting any Claims or Encumbrance against the Debtor's assets, shall be permanently and

forever barred, restrained and enjoined from commencing or continuing in any manner any action or other proceeding of any kind against the Acquired Assets or Purchaser (or its successors, assigns, agents or representatives) as alleged successor or otherwise with respect to any Claims and Encumbrances on or in respect of the Acquired Assets.

7.      Each and every term and provision of the APA, together with the terms and provisions of this Order, shall be binding in all respects upon all entities, including, but not limited to the Debtor, Purchaser, creditors, employees, former employees and shareholders, administrative agencies, governmental departments, secretaries of state, federal, state and local officials and their respective successors or assigns, including but not limited to persons asserting any Claim or Encumbrance against or interest in the Debtor's estate or the Debtor's assets, including any subsequent appointment of a trustee or other fiduciary under any section of the Bankruptcy Code.

8.      Upon the Closing, all entities holding Claims and Encumbrances of any kind and nature against the Debtor's assets hereby are barred from asserting such Claims and Encumbrances against Purchaser (or its successors, assigns, agents or representatives) and/or the Acquired Assets and, effective upon the transfer of the Acquired Assets to Purchaser upon Closing, the Claims and Encumbrances shall attach to the proceeds of the Sale Transaction with the same force, validity, priority and effect, if any, as against the Debtor's assets.

9.      This Order (a) is and shall be effective as a determination that, upon Closing, all Claims and Encumbrances existing as to the Debtor's assets conveyed to Purchaser have been and hereby are adjudged to be unconditionally released, discharged and terminated, with all such Claims and Encumbrances attaching automatically the proceeds in the same manner and priority, and (b) shall be binding upon and govern the acts of all entities, including all filing agents, filing

officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies or units, governmental departments or units, secretaries of state, federal, state and local officials and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Debtor's assets conveyed to Purchaser. All Claims and Encumbrances of record as of the date of this Order shall be removed and stricken as against the Acquired Assets in accordance with the foregoing. All entities are authorized and specifically directed to strike all such recorded Claims and Encumbrances against the Acquired Assets from their records, official or otherwise.

10.	If any person or entity which has filed financing statements, mortgage, *lis pendens* or other documents or agreements evidencing Claims and Encumbrances on the Acquired Assets shall not have delivered to the Debtor prior to closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements and any other documents necessary for the purpose of documenting the release of all Claims and Encumbrances which the person or entity has or may assert with respect to the Acquired Assets, the Debtor is hereby authorized and directed upon closing, and Purchaser is hereby authorized upon closing, to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Acquired Assets. Upon closing of the Sale Transaction, each of the Debtor's creditors is authorized and directed to execute such documents and take all such actions as may be necessary to release their respective Claims and Encumbrances against the Acquired Assets.

11.     Upon closing, Purchaser (or its successors, assigns, agents or representatives) shall not be deemed to be (a) a successor to the Debtor, (b) *de facto* merged with the Debtor or (c) a mere continuation of the other Debtor.  Without limiting the generality of the foregoing, and except as specifically provided in the APA, Purchaser (or its successors, assigns, agents or representatives) shall not be liable for any claims against the Debtor or any of its predecessors or affiliates or assets, other than as expressly provided for in the APA or in this Order.

**Rejection of Contracts**

12.     At or before the Closing, Purchaser shall reject its executory and unexpired contracts (the "Contracts"), including its non-residential lease (the "Real Property Lease" together the "Rejected Contracts") for the premises located at 694 Motor Parkway.

13.     The effective date of rejection of the Rejected Contracts including the Real Property Lease shall be the Closing Date of the Sale Transaction.

**Additional Provisions**

14.     The provisions of this Order and the APA and any actions taken pursuant hereto or thereto shall survive entry of any order which may be entered (a) confirming or consummating any plan of reorganization of the Debtor, (b) converting the Debtor's case from chapter 11 to chapter 7, (c) dismissing the Debtor's bankruptcy case or (d) appointing a chapter 11 trustee or examiner, and the terms and provisions of the APA as well as the rights and interests granted pursuant to this Order and the APA shall continue in this or any superseding case and shall be binding upon the Debtor, Purchaser, and their respective successors and permitted assigns.

15.     Each and every federal, state, and governmental agency or department and any other person or entity is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA.

16.     Nothing contained in any order of any type or kind entered in this chapter 11 case or any related proceeding subsequent to entry of this Order, nor in any chapter 11 plan confirmed in this chapter 11 case, shall conflict with or derogate from the provisions of the APA or the terms of this Order.  Further, the provisions of this Order and any actions taken pursuant hereto shall survive the entry of an order confirming any plan of reorganization or liquidation for the Debtor, the conversion of the Debtor's case from chapter 11 to a case under chapter 7 of the Bankruptcy Code or the dismissal of the Debtor's bankruptcy case.  In any plan of reorganization or liquidation or otherwise, the Debtor shall not make any statement, take any position or take any act that supports an argument that Purchaser assumed debt that is not expressly assumed under the APA.

17.     To the extent, if any, anything contained in this Order conflicts with a provision in the APA, this Order shall govern and control.

18.     Purchaser is purchasing the Acquired Assets in good faith and is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code, and is therefore entitled to the protection of that provision.  The consideration provided by Purchaser for the Acquired Assets is fair and reasonable, and the Sale Transaction may not be avoided under section 363(n) of the Bankruptcy Code.

19.     This Court retains jurisdiction, even in the event of conversion of this chapter 11 case to a case under chapter 7, to (a) interpret, implement and enforce the terms and provisions of this Order (including any injunctive relief provided in this Order) and the terms of the APA, all amendments thereto and any waivers and consents thereunder and of each of the agreements executed in connection therewith; (b) protect Purchaser (and its successors, assigns, agents and representatives) and the Acquired Assets from and against any of the Claims and Encumbrances;

(c) resolve any disputes arising under or related to the APA or the Sale Transaction; (d) adjudicate all issues concerning (alleged) pre-Closing Claims and Encumbrances and any other (alleged) interest(s) in and to the Debtor's assets, including the extent, validity, enforceability, priority and nature of all such (alleged) Claims and Encumbrances and any other (alleged) interest(s); and (e) adjudicate any and all issues and/or disputes relating to the Debtor's right, title or interest in the Debtor's assets, the Motion and/or the APA.

20.    From and after the date hereof, the Debtor shall act in accordance with the terms of the APA and the Debtor, to the extent they have not already done so, shall execute the APA at or prior to Closing.

21.    This Order constitutes an authorization of conduct by the Debtor and nothing contained herein shall be deemed to constitute a ruling with regard to the sovereign immunity of any state.  The failure of any state to object to the entry of this Order shall not operate as a waiver with respect thereto.

22.    This Order and the APA shall be binding in all respects upon all creditors (whether known or unknown) of the Debtor, all successors and assigns of Purchaser, the Debtor and its affiliates and subsidiaries, the Debtor's assets, and any subsequent trustees appointed in the Debtor's chapter 11 case or in any chapter 7 case or upon (a) a conversion of this chapter 11 case to a case under chapter 7 or (b) dismissal of the Debtor's bankruptcy case.

23.    The failure specifically to include any particular provisions of the APA in this Order shall not diminish or impair the efficacy of such provisions, it being the intent of the Court that the APA and each and every provision, term and condition thereof be, and therefore is, authorized and approved in its entirety.

24.    The provisions of this Order are nonseverable and mutually dependent.

25.    The automatic stay of section 362(a) of the Bankruptcy Code shall not apply to and otherwise shall not prevent the exercise or performance by any party of its rights or obligations under the APA, including, without limitation, with respect to any cash held in escrow pursuant to the provisions thereof.

26.    This Sale Order shall take effect immediately and shall not be stayed pursuant to Bankruptcy Rules 6004(g), 6004(h), 6006(d), 7062, or otherwise.

**Exhibit B**

**Asset Purchase Agreement**

Execution Version

_____

**ASSET PURCHASE AGREEMENT**

**dated as of**

**December 16, 2015**

**by and between**

**Roxanne Gail Carfora, D.O., P.C. d/b/a Ageless 360 Medical Group**

**and**

**Long Island Practice Management LLC**

_____

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this "**Agreement**") is entered into as of December 16, 2015, by and between ROXANNE GAIL CARFORA, D.O., P.C. D/B/A AGELESS 360 MEDICAL GROUP, a New York corporation ("**Seller**"), and LONG ISLAND PRACTICE MANAGEMENT LLC, a New York limited liability company ("**Purchaser**").

## W I T N E S S E T H:

**WHEREAS**, on October 9, 2015, Seller filed a voluntary petition for reorganization under Chapter 11 of Title 11 of the United States Code, as amended (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Eastern District of New York (the "**Bankruptcy Court**") under Case Number 15-74328 (REG) (the "**Bankruptcy Case**");

**WHEREAS**, Seller operates a medical practice offering several specialties and related services to patients (the "**Business**");

**WHEREAS**, Purchaser desires to purchase the Acquired Assets (as defined below) and Seller desires to sell the Acquired Assets to Purchaser on the terms and conditions set forth in this Agreement, in accordance with Sections 105, 363 and 365 of the Bankruptcy Code and in accordance with other applicable provisions of the Bankruptcy Code; and

**NOW, THEREFORE**, in consideration of the foregoing premises and of the mutual agreements and covenants hereinafter set forth, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1    <u>Certain Definitions</u>.  For purposes of this Agreement, the following terms shall have the following meanings:

"**Accounts Receivable**" shall mean (i) all accounts receivable and other rights to payment from customers of the Seller with respect to goods sold and services rendered by the Business before the Closing Date, and the full benefit of all security for such accounts or rights to payment, (ii) all other accounts or notes receivable of Seller with respect to goods sold and services rendered by the Business before the Closing Date and the full benefit of all security for such accounts or notes, and (iii) any claim, remedy or other right related to any of the foregoing.

"**Acquired Assets**" has the meaning ascribed to it in <u>Section 2.1</u>.

"**Affiliate**" means, with respect to any Person, any other Person that directly, or through one or more intermediaries, controls or is controlled by or is under common control with such Person.  For purposes of this Agreement, "control" means, as to any Person, the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by Contract or otherwise (and the terms "controlled by" and "under common control with" shall have correlative meanings).

-1-

"**Agreement**" has the meaning ascribed to it in the preamble hereto.

"**Alternative Transaction**" means any one of the following transactions with or by any Person or group (other than the Purchaser): (a) a merger, consolidation, recapitalization or similar transaction involving Seller; or (b) a sale, lease or other disposition directly or indirectly by merger, consolidation, recapitalization, tender offer, share exchange or otherwise of any asset of Seller included in the Acquired Assets; or (c) a sale or similar transaction or business combination involving the Acquired Assets to a Competing Offeror which sale is approved by the Bankruptcy Court (defined below).

"**Avoidance Actions**" means all causes of action of Seller under Sections 544 through 553 of the Bankruptcy Code with respect to payments or transfers of property made prior to the filing of the Bankruptcy Case.

"**Bankruptcy Case**" has the meaning ascribed to it in the recitals hereto.

"**Bankruptcy Code**" has the meaning ascribed to it in the recitals hereto.

"**Bankruptcy Court**" has the meaning ascribed to it in the recitals hereto.

"**Bankruptcy Rules**" has the meaning ascribed to it in Section 10.1.

"**Bill of Sale**" means the Bill of Sale, in substantially the form attached hereto as Exhibit A.

"**Break-up Fee**" has the meaning ascribed to it in Section 7.14.

"**Business**" has the meaning ascribed to it in the recitals hereto.

"**Business Day**" means any day other than a Saturday or Sunday or any day on which banks in New York City are authorized or required to close.

"**Claims and Encumbrances**" means any and all liens, claims (as defined in section 101(5) of the Bankruptcy Code), security interests, mortgages, encumbrances, obligations, including employee benefit obligations charges against or interests in property, adverse claims, claims of possession, rights of way, licenses, easements or restrictions of any kind, demands, guarantees, actions, suits, defenses, deposits, credits, allowances, options, rights, restrictions, limitations, contractual commitments, rights of first refusal, rights of setoff or recoupment, or interests of any kind or nature whether known or unknown, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or unasserted, whether arising prior to or subsequent to the commencement of the Bankruptcy Case, whether imposed by agreement, understanding, law, equity or otherwise, subject to applicable law, including section 363 of the Bankruptcy Code.

"**Closing**" has the meaning ascribed to it in Section 4.1.

"**Closing Date**" has the meaning ascribed to it in Section 4.1.

"**Confidential Information**" means confidential or proprietary information about the Purchaser, the Seller and/or its respective Patients, clients, or customers, including but not limited to, trade secrets, methods, models, passwords, access to computer files, financial information and records, computer software programs, agreements and/or contracts between the Seller and its respective Patients, clients and customers, creative policies and ideas, educational and strategic marketing support products, methods of operation, financial or business projections of the Seller or the Purchaser and information about or received from the Seller's or the Purchaser's clients or customers and other companies with which the Seller or the Purchaser do business.

"**Consent**" means any consent, approval, authorization, license or order of, registration, declaration or filing with, or notice to, or waiver from, any Governmental Entity or any other Person, including, without limitation, any security holder or creditor which is necessary to be obtained, made or given in connection with the execution and delivery of this Agreement or any other Purchase Document, the performance by a Person of its obligations hereunder or thereunder and the consummation of the transactions contemplated hereby or thereby.

"**Contract**" means any contract, agreement, indenture, note, bond, loan, instrument, lease, sub-lease, deed of trust, conditional sales contract, mortgage, franchise, license, commitment or other binding arrangement, express or implied currently in effect.

"**Deposit**" shall mean $25,000 to be held in escrow by counsel to the Seller.

"**Disclosure Schedules**" means the disclosure schedules, dated the date hereof, which has been delivered to the Purchaser by the Seller in connection with this Agreement.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

"**Excluded Assets**" has the meaning ascribed to it in Section 2.2.

"**Excluded Contracts**" has the meaning ascribed to it in Section 2.2(a).

"**Final Order**" means an order or judgment of the Bankruptcy Court (a) which is not the subject of a pending appeal, petition for certiorari, or other proceeding for review, rehearing or reargument, (b) which has not been reversed, stayed, modified or amended and (c) for which the time to appeal from or petition for certiorari or to seek review, rehearing or reargument of such order shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Bankruptcy Rules and other applicable rule or law, and there shall not be in effect any preliminary or permanent injunction, stay or order or decree or ruling by any Governmental Entity preventing consummation of the transactions contemplated by this Agreement.

"**Governmental Entity**" means any federal, state, local or foreign government, political subdivision, legislature, court, agency, department, bureau, commission or other governmental, regulatory or administrative authority, body or instrumentality, including any industry or other non-governmental self-regulatory organizations.

"**Inventory**" means all items of inventory, including but not limited to, all work in process or production, materials and supplies, previous publications and issues.

"**Liability**" means all liabilities of any kind whatsoever (whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, due or to become due, and whether or not reflected or required by GAAP to be reflected on a balance sheet) including, without limitation, any direct or indirect guarantee of any Liability of any other Person.

"**Material Adverse Effect**" means any material adverse effect in or on the Business, operations, assets, properties, rights, condition or prospects (financial or otherwise) of Seller, or any occurrence, circumstance, or combination thereof which reasonably could be expected to result in any such material adverse effect, including, without limitation, the termination or modification for any reason of any of the Contracts.

"**Owner**" means the Seller's sole shareholder.

"**Patents**" means (a) all letters patent of the United States of America, any other country or any political subdivision thereof, all reissues and extensions thereof and all goodwill associated therewith, (b) all applications for letters patent of the United States of America or any other country and all divisions, continuations and continuations-in-part thereof, and (c) all rights to obtain any reissues or extensions of the foregoing.

"**Patient(s)**" means any individual who is currently or was previously a patient of the Business.

"**Patient List**" means the list of Patients maintained by the Business.

"**Permits**" means all franchises, licenses, permits, consents authorizations, approvals, and certificates of any Governmental Entity relating to the Business or the Acquired Assets.

"**Person**" means an individual, corporation, partnership, limited liability company, association, trust or any other entity or organization.

"**Plan**" means any "employee benefit plan" (as defined in Section 3(3) of ERISA) or any other bonus, deferred compensation, pension, profit-sharing, retirement, stock purchase, stock option, stock appreciation, other forms of incentive or equity compensation, excess benefit, supplemental pension insurance, disability, medical, dental, vision, supplemental unemployment, other paid time-off, vacation benefits, payroll practice, fringe benefit, scholarship, sickness, accident, severance, legal or post-retirement compensation or benefit, welfare or any other employee benefit plan, arrangement or practice, whether written or oral.

"**Purchase Documents**" has the meaning ascribed to it in Section 5.3.

"**Purchaser**" has the meaning ascribed to it in the preamble hereto.

"**Real Property Lease**" has the meaning ascribed to it in Section 3.4.

"**Sale Hearing**" has the meaning ascribed to it in <u>Section 10.1</u>.

"**Sale Motion**" means the motion filed in the Bankruptcy Court on behalf of Seller, for among other things, approval of the sale of the Acquired Assets to Purchaser.

"**Sale Order**" means one or more orders of the Bankruptcy Court authorizing among other things, the sale of the Acquired Assets to Purchaser.

"**Secured Liens**" shall means the liens on the Seller's assets held by 134 S. Central Ave. Corp., Kirschenbaum & Kirschenbaum, P.C., and Leonard and Ramona DeMarco.

"**Seller"** has the meaning ascribed to it in the preamble hereto.

"**Software**" means all software, including software related to Electronic Medical Records, object code, source code, html code, executable code, binary code, other programming code, objects, software development tools, methods and protocols, computer programs, instructions and routines, comments, screens, user interfaces, report formats, templates, databases, support logs, scripts, design notes, supporting technical and user documentation and media for all applications of any kind and all obsolete and unsupported versions as well as all currently-supported versions of the foregoing, together with all customizations, enhancements, modifications, updates, upgrades, patches and works-in-progress, and all intellectual property rights therein.

"**Tax**" (or "**Taxes**" where the context requires) shall mean all federal, state, county, provincial, local, foreign and other taxes (including, without limitation, income, profits, premium, estimated, excise, sales, use, transfer, occupancy, gross receipts, franchise, ad valorem, severance, capital levy, production, transfer, withholding, employment and payroll related and property taxes and other governmental charges and assessments), whether attributable to statutory or nonstatutory rules and whether or not measured in whole or in part by net income, and including, without limitation, interest, additions to tax or interest, charges and penalties with respect thereto, and expenses associated with contesting any proposed adjustment related to any of the foregoing.

"**Tax Code**" means the Internal Revenue Code of 1986, as amended.

"**Tax Returns**" means each and every report, return, declaration, information return, statement or other information, and any schedule, attachment, or amendment thereto, filed or required to be filed with or supplied to a taxing or governmental authority with respect to any Tax or Taxes, including, without limitation, any combined, consolidated or unitary return for any group of entities including Seller.

"**URLs**" has the meaning ascribed to it in <u>Section 5.6</u>.

"**USPTO**" means the United States Patent and Trademark Office.

"**Website**" has the meaning ascribed to it in <u>Section 2.2(f)</u>.

## ARTICLE II
## PURCHASE AND SALE OF ASSETS

Section 2.1    <u>Purchase and Sale of Acquired Assets</u>.  Upon and subject to the terms and conditions set forth in this Agreement and the Sale Order, on the Closing Date, Seller will sell, assign, convey, transfer and deliver to Purchaser pursuant to sections 363(b) and (f) and 365 of the Bankruptcy Code, free and clear of all Claims and Encumbrances, and Purchaser will purchase and acquire from Seller, all of Seller's right, title and interest in, to and under the following assets, properties and rights used by Seller in the Business (collectively, the "**<u>Acquired Assets</u>**"):

(a) all leasehold improvements, non-movable equipment, furniture, fixtures and equipment, except for furniture in the aesthetic room and acupuncture room, and vitamin equipment and inventory;

(b) prepayments for future goods or services;

(c) all policies and procedures manuals and computer software (including but not limited to Electronic Medical Record (EMR) software);

(d) all telephone and facsimile numbers, emails, domain names, websites and all accounts on any third-party websites owned or used by the Business, except as provided for in the Excluded Assets; EMR access and administrative codes (e.g. log in information);

(e) all Patient Lists and data;

(f) all employee and payroll records;

(g) goodwill and the assumed name "Ageless 360 Medical Group"; .

(h) all Accounts Receivable;

(i) all transferable licenses and permits (if any);

(j) the security deposit being held by the Seller's landlord; and

(k) exclusive access to patient records.

In confirmation of the foregoing sale, assignment and transfer, Purchaser and Seller shall execute and deliver at the Closing the Bill of Sale.

Section 2.2    <u>Excluded Assets</u>.  Notwithstanding any other provision of this Agreement to the contrary, the following Assets of the Seller existing on the Closing Date (collectively, the "**<u>Excluded Assets</u>**") are not part of the sale and purchase contemplated hereunder, are excluded from the Acquired Assets and shall remain the property of the Seller after the Closing:

(a) any agreements that the Seller may be a party including those listed on Schedule 2.2(a), including but not limited to any lease for real or personal property, and any agreements, understandings, or other arrangements with any employees, vendors, or independent contractors and any agreements with any insurance companies or other third party payors (the "Excluded Contracts");

(b) ownership of any patient records (subject to Purchaser's exclusive right to access the patient records);

(c) any cash or cash equivalents that the Seller may have on hand;

(d) any books and records of the Seller other than those related to the Acquired Assets or expressly listed among the Acquired Assets;

(e) all Contracts;

(f) furniture in the aesthetic room and acupuncture room at the Business, and vitamin equipment and inventory currently located at the Business;

(g) ownership of the domain name, URL, and website www.drcarfora.com (the "**Website**"), provided that, Seller delete all content on the Website referring to Ageless 360 Medical Group on the Closing Date; and

(h) the personal property listed on Schedule 2.2(g) annexed hereto.

Section 2.3    Purchase Price.    The purchase price for the Acquired Assets is (a) $115,000 (the "**Cash Purchase Price**") and (b) 72.5% of the Accounts Receivable collected by Purchaser within six months of the Closing Date (the "**A/R Purchase Price**" together with the Cash Purchase Price, the "**Purchase Price**").    The Cash Purchase Price shall be payable at the Closing by wire transfer or other immediately available funds and the A/R Purchase Price shall be paid monthly after the Closing Date.    Purchaser has the option, but is not required to, retain a collections firm or to commence legal action to collect Accounts Receivable.

Section 2.4    Allocation of Cash Purchase Price.    The parties agree to allocate the Cash Purchase Price as follows: (i) $52,500 to leasehold improvements, non-movable equipment, furniture, fixtures, and equipment, (ii) $52,500 to the unencumbered assets of the Seller, and (iii) $10,000 to goodwill.

## ARTICLE III
## LIABILITIES NOT ASSUMED

Section 3.1    Non-Assumption of Liabilities.    Notwithstanding the provisions of this Agreement, Purchaser shall not assume, and Seller shall retain and remain liable for:

a) any amounts due third party payors, as a result of retroactive rate reductions, audits or otherwise, relating to services rendered by the Seller before the Closing Date; and

b) any debt or liability relating to the ownership or operation of the Seller or the Acquired Assets.  Such excluded liabilities shall include, but not be limited to:

(i)        for any Taxes;

(ii) any liability or obligation arising out of a breach or default by Seller under any governmental or private contract, or Permit or License, attributable to any period prior to the Closing Date;

(iii) liabilities for personal injuries or property damage;

(iv) the cost of accrued employee wage and fringe benefit liabilities, including, but not limited to, holiday pay, sick pay, vacation pay, personal day pay, severance pay, pension and welfare liabilities, other employee benefits and entitlements, and employer tax liabilities relating thereto arising before the Closing Date; and

(v) any claims, liabilities and obligations of any kind arising out of, or resulting from the ownership or use of the Excluded Assets.

(vi) any liability of the Seller, including but not limited to, all liabilities, Claims and Encumbrances in the Bankruptcy Proceeding.

Section 3.2    Intentionally Omitted

Section 3.3    <u>No Assumption of Real Property Lease</u>.  For the avoidance of doubt, Purchaser is not assuming and Seller is not assigning any rights or obligations of Seller's lease for the real property (the "**<u>Real Property Lease</u>**") located at 694 Motor Parkway, Hauppauge, NY (the "**<u>Real Property</u>**") except as listed in the Acquired Assets with respect to leasehold improvements and security deposit.  As described herein, Purchaser and the landlord for the Real Property (the "**<u>Landlord</u>**") shall have executed a new lease for the Real Property, with the effectiveness of such new lease contingent and subject to entry of the Sale Order.  Seller shall reject the Real Property Lease in accordance with the requirements of the applicable provisions of the Bankruptcy Code.   The new lease negotiated between Purchaser and the Landlord shall contain an acknowledgement that the Landlord shall have no claim against the Seller's bankruptcy estate, provided that the Seller is current with all lease provisions, including, but not limited to all rent through the Closing Date. .

**ARTICLE IV
CLOSING; CLOSING OBLIGATIONS**

Section 4.1    <u>Date, Time and Place of Closing</u>.  The transactions provided for by this Agreement shall be consummated (the "**Closing**") at 10:00 a.m., local time, at the offices of Klestadt Winters Jureller Southard & Stevens, LLP, 200 West 41st St., 17th Floor, New York, New York 10036, or remotely via the exchange of documents and signatures in PDF format or by facsimile, within ten (10) Business Days following the date on which all of the conditions to

the parties obligations set forth in Articles VIII, IX and X (other than conditions to be satisfied by the delivery of documents at the Closing, but subject to the satisfaction of such conditions at the Closing) have been satisfied or waived in writing by the or parties entitled to the benefit thereof, or such other date or place as may be agreed upon by the parties hereto.  The date and time of Closing is hereinafter sometimes called the "**Closing Date**."

Section 4.2    Closing Deliveries.  At the Closing the following agreements, instruments and documents shall be executed and delivered:

(a) Bill of Sale:  The Seller and Purchaser shall execute and deliver a Bill of Sale in the form attached hereto as **Exhibit A**.

(b) Employment Contract.  Purchaser and the Owner shall execute and deliver an Employment Agreement in substantially the form attached hereto as **Exhibit B** (the "**Employment Agreement**").

(c) Resolutions.  The Purchaser and Seller shall each deliver written resolutions of their respective members, managers, shareholders and/or board of directors (as applicable) authorizing the transactions contemplated herein.

Section 4.3    Accounts Receivable..On the Closing Date, Seller shall provide Purchaser with a list of all its Accounts Receivable and the invoice dates thereof and the name of the payee.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF SELLER

As a material inducement to Purchaser to enter into this Agreement and purchase the Acquired Assets and assume the Assumed Liabilities, Seller hereby represents and warrants to Purchaser as of the date hereof and as of the Closing Date that:

Section 5.1    Ownership and Condition of Assets.  The Seller has good and marketable title to all the Acquired Assets, free and clear of any liens, whether arising by operation of any law, judgment, decree or agreement.  The Assets being transferred to the Purchaser are sufficient for the operation of the Seller's Businesses as currently conducted

Section 5.2    Organization and Qualification.  Seller is a corporation organized, validly existing and in good standing under the laws of the State of New York, and has full power and authority to own its properties and to carry on its business as presently conducted by it.  Seller is duly qualified to do business and is in good standing in all other jurisdictions where the conduct of its business so requires, except where the failure to be so qualified and in good standing would not be reasonably likely to have a Material Adverse Effect.

Section 5.3    Authority, Effective Agreement; No Breach.

(a)    Subject to the Sale Order, Seller has the requisite power and authority to execute and deliver this Agreement, to perform its obligations under this Agreement and any and all other agreements, documents or instruments to be executed and/or delivered in connection

herewith (collectively, the "**Purchase Documents**") and to consummate the transactions contemplated herein and therein. Seller has taken all actions required by Seller to authorize the execution, delivery and performance of the Purchase Documents and the consummation of the transactions contemplated thereby. This Agreement has been duly and validly executed and delivered by Seller and, subject to entry of the Sale Order, constitutes a legal, valid and binding obligation of Seller enforceable against Seller in accordance with its terms.

(b)    Except with regard to the contemplated approval and authorization of the Bankruptcy Court, neither the execution and delivery of this Agreement or any other Purchase Document by Seller nor the consummation of any of the transactions contemplated herein or therein, nor the full performance by Seller of its obligations hereunder or thereunder do or will: (i) violate any provision of the certificate of incorporation, bylaws or similar organizational documents of Seller; (ii) conflict with, result in a breach or violation of, or constitute a default under (or an event which, with or without notice, lapse of time or both, would constitute a default) or result in the invalidity of, or accelerate the performance required by or cause or give rise to any right of acceleration or termination of any right or obligation pursuant to any agreement or commitment to which Seller is a party or by which Seller (or any of the Acquired Assets) is subject or bound; (iii) result in the creation of, or give any third party the right to create, any Encumbrance upon the Acquired Assets; (iv) conflict with, violate, result in a breach of or constitute a default under any writ, injunction, statute, law, ordinance, rule, regulation, judgment, award, Permit, decree, order, or process of any Governmental Entity to which Seller or any Acquired Assets are subject; (v) terminate or modify, or give any third party the right to terminate or modify, the provisions or terms of any contract or agreement to which Seller is a party or by which Seller or any of the Acquired Assets is subject or bound; (vi) require Seller to obtain any Consent, or (vii) result in or give to any Person any additional rights or entitlement to increased, additional, accelerated or guaranteed payments under any contract or agreement to which Seller is a party or by which any of the Acquired Assets is subject or bound.

Section 5.4    Brokers' Fees. The Seller has no liability or obligation to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated by this Agreement for which the Purchaser could become liable or obligated.

Section 5.5    Title to Acquired Assets.    At the Closing, Seller will convey, and Purchaser will obtain, good and valid title to all of the Acquired Assets free and clear of any and all Claims and Encumbrances pursuant to Section 363 of the Bankruptcy Code and any other applicable sections of the Bankruptcy Code and as set forth in the Sale Order.

Section 5.6    Intellectual Property

(a)    Websites. The Seller currently owns the Website. Seller will retain ownership of the Website, provided that Seller deletes all content referring to Ageless 360 Medical Group on the Closing Date.

(b)    Adequacy and Infringement.    The Seller owns or has the right to use pursuant to license, sublicense, agreement, or permission all material Intellectual Property necessary or used for the operation of the Business as presently conducted. To the knowledge of Seller, the Seller has not interfered with, infringed upon, misappropriated, or otherwise come into conflict with

any Intellectual Property rights of third parties, and the Seller has never received any charge, complaint, claim, demand, or notice alleging any such interference, infringement, misappropriation, or violation (including any claim that the Seller must license or refrain from using any Intellectual Property rights of any third party). To the knowledge of Seller, no third party has interfered with, infringed upon, misappropriated, or otherwise come into conflict with any Intellectual Property rights of the Seller.

(c)     Trademarks.   The Business does not own any trademarks. Owner owns the trademark "Ageless 360" (the "Trademark").  At the Closing, Owner shall deliver or cause to be delivered a Trademark assignment, duly executed by Owner.

Section 5.7     Contracts.

(a)     All Contracts to which Seller is a party is set forth on Schedule 2.2(a).  Seller has delivered to Purchaser or otherwise provided Purchaser with access to true and complete copies of all Contracts.

(b)     Seller shall reject the Contracts set forth on Schedule 2.2(a) in accordance with the provisions of applicable bankruptcy law.  Seller shall pay the rejection damages, if any, in connection with such rejection.

Section 5.8     Litigation.  Except (a) the matters set forth in Schedule 5.8, and (b) any matters that will be resolved by the Sale Order, there is no judicial or administrative action, suit, proceeding or investigation pending or, to the Knowledge of the Seller, threatened with respect to Seller or its employees, principals, or agents.

Section 5.9     Compliance with Law; Necessary Authorizations.   The Seller is in compliance in all material respects with all Applicable Laws relating to the operation or conduct of the Business. Seller has duly complied with all applicable laws, rules, regulations, orders, building and other codes or ordinances, Permits, authorizations, judgments and decrees of all Governmental Entities.  There are no restrictions imposed by any Governmental Entity in respect of the Business or affecting the Seller.

Section 5.10     Financial Statements.  The financial results and information set forth in the Seller's Monthly Operating Reports as filed with the Bankruptcy Court are true and correct in all material respects.

Section 5.12     Disclosure.  No representation or warranty by Seller in this Agreement, in any documents or papers furnished to Purchaser or its representatives by or on behalf of Seller, pursuant to this Agreement or any Purchase Document or any certificates delivered hereunder contains or will contain any untrue statement of material fact or omits to state a material fact required to be stated therein or necessary to make the statements contained therein in light of the circumstances under which it was made, not false or misleading.  All copies of contracts, agreements and other documents made available to Purchaser or any of its representatives pursuant hereto are complete and accurate.

Section 5.13     Employees.    Schedule 5.13 contains a complete and accurate list of the following information for each then current employee of Seller (individually, an "**Employee**"),

including each Employee on leave of absence or layoff status: (i) name; (ii) job title; (iii) hourly rate payable and any change in compensation since January 1, 2015; (iv) accrued vacation, and (v) other accrued leave.

Section 5.14    Property.

(a)    The Seller owns no real property. The only real property leased by the Seller is the Real Property located at 694 Motor Parkway, Hauppauge, New York and leased pursuant to the Real Property Lease. Aside from the security interest of Leonard and Ramona DeMarco in the Lease and all FF&E at the Real Property, the Seller has a valid leasehold interest in the Real Property, free and clear of all liens. The Real Property Lease is in full force and effect, and true, correct and complete copies thereof have been delivered to the Purchaser. No default exists under the Lease, and no event has occurred under the Real Property Lease which, but for the giving of notice or the passage of time, or both, would constitute a breach or default thereunder.

(b)    All improvements located on the Real Property and all tangible personal property currently in use by the Seller are in operating condition and repair, subject to ordinary wear and tear, and are performing the functions for which they were intended. Seller possesses all Certificates of Occupancy and permits required to allow the Business to be conducted.

Section 5.15    Taxes. The Seller has duly filed all federal, state and local Returns which are required to be filed by them prior to the Effective Date and have paid all Taxes which are shown thereon to be due and all other Taxes imposed by law upon them or any of their properties, assets, income, receipts, payrolls, transactions, capital, net worth or franchises which have become due and payable. No transfer, property or other Taxes are or will be payable (including, without limitation, as a result of an audit or other official inquiry before or after the Closing) by the Purchaser or the Seller in respect of the sale by the Seller. No tax liens have been filed and neither the Internal Revenue Service, the New York State Department of Taxation and Finance, nor any other taxing authority is now asserting or, to the Knowledge of the Seller and Owner, threatening to assert against the Seller any deficiency or claim for additional Taxes. No Return of the Seller is currently under audit by the Internal Revenue Service, the New York State Department of Taxation and Finance, or by the taxing authorities of any other jurisdiction.

Section 5.16    Insurance. Schedule 5.16 of the Disclosure Schedules contains a complete and correct list and accurate summary description of all insurance policies maintained by the Seller. The Seller has delivered to the Purchaser complete and correct copies of all such policies together with all riders and amendments thereto. Such policies are in full force and effect, and all premiums due thereon have been paid. The Seller has complied in all respects with the terms and provisions of such policies.

Section 5.17    Licenses; Permits. Seller possesses all licenses and permits required for the occupancy and operation of the Business as a medical practice at the Property. To the best of Seller's knowledge, there are no violations of law or of municipal ordinances or of licenses, permits or regulations affecting the Seller or the Property or their occupancy or operations.

Section 5.18    The Seller participates as a provider in the Medicare programs pursuant to Medicare provider agreements and the health plans listed on Schedule 5.18 (the "Health Plans").

Section 5.19    No limitations or restrictions have been placed upon the Seller's licenses or the Seller's participation in the Health Plans.  Seller has received no notice, and does not have any knowledge of the pendency, of any proceeding to revoke, suspend, limit or take any adverse action relating to the licensure and participation referred to in Sections 5.17 and 5.18 hereof.

Section 5.20 Equipment.  All equipment used in connection with the operation of the Business (except for equipment which is the subject of a lease listed on Schedule 5.20 annexed hereto) is owned by Seller.  All software in use on Seller's computers is, and on the Closing Date has been installed properly in compliance with copyright and license agreement with the publishers of such software and such licenses are all freely assignable without any consideration or notice to the licensor or any other person.  No tangible assets of Seller are located at any location other than the Property.

Section 5.21    Operations.  The Business is presently operating in substantial compliance with all applicable federal and state statutes, rules and regulations.  The furniture, fixtures and equipment included in the Acquired Assets are presently of sufficient quality and quantity to operate the Business in compliance with applicable statutes, rules and regulations.

Section 5.22    Investigations.  Annexed hereto as Schedule 5.XX  is a copy of the results of all audits or investigations relating to Business, or any of its providers conducted during the past seven (7) years.

Section 5.23    Violations.  To the best of Sellers' knowledge, there are presently no building, safety or other violations relating to the Business or the Property, and the construction and operation of the Business and the Property are in accordance with, conform to and are not in violation of the Property Lease or any applicable building or fire code, law, or other statute, rule, regulation or ordinance, whether state, municipal or federal.

Section 5.24 Option.  No person, firm, corporation or other entity has any right or option to acquire the Acquired Assets or any part thereof from Seller.

Section 5.25 Intentionally Omitted.

Section 5.26 Material Facts.  No representation, warranty, statement made or information furnished by Seller in this Agreement, or otherwise in connection with this Agreement, contains any untrue statement of material fact or omits to state any material fact necessary in order to make such statement not misleading.

Section 5.27    Name.  Other than the name "Ageless 360 Medical Group" and "Carfora Family Medicine," Seller has not been known by any other name for the past twenty years.  Seller has not, at any time, authorized any person, entity or business to use the trade name "Ageless 360 Medical Group" or any derivatives thereof for any purposes whatsoever except on behalf of Seller. Seller hereby consents for Purchaser to file same name as an assumed name with New York State Department of State.

Section 5.28  Taxes

(a) Seller has: (i) timely and accurately filed all tax returns for federal, state and local income, payroll, withholding, excise, sales, franchise, use, personal property, use and occupancy, business and occupation, real estate, or other tax of whatever nature (all the foregoing taxes, including interest and penalties thereon and including estimated taxes, collectively "Taxes") required to be filed for all periods prior to and through the Closing Date; (ii) paid and will pay all Taxes which are shown to have become due pursuant to such returns and there are no unpaid Taxes with respect to any period prior to and through the Closing Date, which are or could become a Lien on the Seller or any of the Acquired Assets, except for current Taxes not yet due and payable; and (iii) paid all other Taxes for which a notice of or assessment or demand for payment has been received prior to the Closing Date.

(b) Seller has properly characterized all individuals performing services for it as employees or independent contractors, as the case may be, as of the Closing Date, and, in every case where an individual performing services should have been characterized as an employee, Seller has, as of the Closing Date: (x) withheld and paid over to the appropriate government agency all applicable taxes on the individual's compensation (including, without limitation, federal and state income tax, employee's Social Security (FICA) tax, and employees' New York unemployment and disability tax and wage taxes); and (y) paid all Taxes imposed on employers (including, without limitation, federal unemployment tax, employers' Social Security (FICA) tax, and employers' New York unemployment tax).

(c) There are no Liens for Taxes upon the Seller, or any of the Assets on account of periods prior to the Closing Date.

(d) Seller has not received notice of any audit or of any proposed deficiencies from the IRS or any other taxing authority on account of periods prior to the Closing Date (other than routine audits undertaken in the ordinary course and which have been resolved on or prior to the Closing Date).

(e) To Seller's knowledge, neither the IRS nor any other taxing authority is now asserting or, to Seller's knowledge, threatening to assert against Seller any deficiency or claim for additional Taxes or interest thereon or penalties in connection therewith for periods prior to the Closing Date.

Section 5.29  Compensation; Compensation Policies; Employee Relations.

(a) Attached hereto as Schedule 5.29(a) is a complete and accurate list of all of the directors, officers, employees and agents of Seller, identifying for each such individual his or her position and whether classified as exempt or non-exempt for wage and hour purposes, as well as the annual base salary, whether paid on a salary, hourly or commission basis, and the actual compensation for each such person.

(b) Attached hereto as Schedule 5.29(b) is Seller's compensation and bonus policy as of the Closing Date, and true and correct copies of all written agreements, including all amendments thereto, with all officers, employees, consultants, independent contractors and any others who provide goods, services or the like to the Business, as of the Closing Date.

(c) As of the Closing Date, except as set forth in Schedule 5.29(c), Seller had no (i) Plans or (ii) other contracts, programs, funds, or arrangements in respect of any employees of Seller with respect to which Seller made or was required to make payments, transfers or contributions.

(d) As of the Closing Date, except as set forth in Section 5.29(b), Seller was not a party to any written or oral employment agreements with any of its officers, employees, consultants, independent contractors, agents or other persons, and each such relationship was terminable by Seller at will without penalty or cost to Seller except to the extent of the applicability of any legal restrictions or restraints on the right of an employer to terminate an at-will employment relationship, and no representations have been made, whether in policy manuals, handbooks, or other written materials or orally, which alter the at-will relationship between Seller and any of its employees.

(e) As of the Closing Date, there is no pending, or to the knowledge of Seller or Seller's Owner threatened, federal, state or local complaint, charge, proceeding or investigation involving discrimination, sexual or other harassment, immigration violation, unlawful discharge, wage and hour claims, workers compensation, unemployment compensation, or any other claim, proceeding, complaint, charge or the like arising out of or based on any employment relationship or termination of such relationship.  As of the Closing Date, Seller was not delinquent in payments to any of its employees (with the exception of the Owner) for any wages, salaries, commissions, bonuses, severance, termination pay, consulting fees or other direct compensation or remuneration for any services performed therefore or amounts required to be reimbursed to such employees.

(f) Seller has complied with and as of the Closing Date will comply with all federal and New York State laws affecting the employment relationship, including without limitation, the Consolidated Omnibus Budget Reconciliation Act ("COBRA") and the Workers Adjustment and Retraining Notification Act 29, U.S.C. 2101(a)(2) et seq. ("WARN Act"), if applicable. To Seller's knowledge, none of the employment policies or practices of Seller are currently being audited or investigated or, to Seller's knowledge, are subject to imminent audit or investigation by any governmental authority.  As of the Closing Date, Seller was not subject to any consent decree, court order, injunction or settlement in respect of any labor or employment matters.

(g) As of the Closing Date, Seller was not a party to or subject to any collective bargaining agreements.  To Seller's knowledge, as of the Closing Date, (i) no labor union or other collective bargaining unit represents or claims to represent any of Seller's employees and (ii) there was no union campaign being conducted to solicit cards from employees to authorize a union to request a National Labor Relations Board certifications election with respect to Seller's employees.

(h) On the Closing Date, Seller will discharge all its employees and refer them to Purchaser for possible employment by Purchaser at Purchaser's option and in Purchaser's sole discretion.  Seller shall be exclusively liable for all obligations and liabilities, including, without limitation, accrued vacation pay and sick pay, that may arise or have arisen prior to the Closing Date from the employment of employees with, or the termination of their employment by, Seller

on or prior to the Closing Date.  Seller agrees to pay all such obligations or liabilities or promptly reimburse Purchaser in the event that Purchaser assumes such obligations or liabilities failing payment by Seller.

Section 5.30 <u>Immigration and Nationality Act</u>.  To the Seller's knowledge, as of the Closing Date, Seller was in compliance with the terms and provisions of the Immigration and Nationality Act (the "Immigration Act") for each of Seller's employees for whom compliance with the Immigration Act was required.  As of the Closing Date, Seller had not been cited, fined, served with a Notice of Intent to Fine or with a Cease and Desist Order, nor, to the best knowledge of Seller was any action or administrative proceeding been initiated or threatened against Seller by reason of any actual or alleged failure to comply with the Immigration Act.

Section 5.31  <u>Conflicts of Interest</u>.  Neither Seller, nor any affiliate or principal of Seller, directly or indirectly, now or within the three (3) years prior to the Closing Date has or had an equity or debt interest in any business or organization that furnishes, sells, or purchases any services or products to or from Seller.

Section 5.32  <u>Illegal Payments</u>. Neither Seller nor, to Seller's knowledge, any person affiliated with Seller, has ever offered, made or received on behalf of Seller any illegal payment or contribution of any kind, directly or indirectly, including payments, gifts or gratuities, to any person, entity, or United States or foreign national, state or local government officials, employees or agents or candidates therefore or other persons.

Section 5.33 <u>Privacy</u>

a) As of the Closing Date, Seller had the requisite privacy and security policies, procedures and systems to comply with the Health Insurance Portability and Accountability Act of 1996, Pub. L. 104-99 and its associated regulations ("HIPAA").

b) Seller has not received any written (or, to Seller's knowledge, oral) complaints, or notices of inquiry or investigation, from any person, client or customer regarding its or any of its agents', employees' or contractors' uses or disclosures of, or security practices regarding, individually identifiable health information or other medical or personal information for periods prior to the Closing Date.

c) As of the Closing Date, Seller had policies, procedures and systems in place to ensure the privacy and security of all business, proprietary, individually identifiable, personal, medical and any other private information, in compliance with HIPAA.  In addition, Seller had adequate policies, procedures and systems in place to prevent improper use or disclosure of, or access to, all business, proprietary, individually identifiable, personal, medical and any other private information.

-Section 5.34 <u>Electronic Transactions; Identifiers</u>As of the Closing Date, Seller conducted the Business in compliance with the HIPAA regulations governing electronic transactions (45 C.F.R. Parts 160 and 162, Subparts I through R) and unique identifiers (45 Parts 160 and 162, Subparts D and F).

Section 5.35 <u>Insurance</u>.   <u>Schedule 5.35</u> sets forth a true and complete list of: (i) all insurance policies or self-insurance funds of any nature whatsoever maintained by Seller as of the Closing Date covering the ownership and operation of the Business and the Assets (including, but not limited to, any state sponsored plan or program for worker's compensation) (the "Insurance Policies"), including the Insurance Policies' numbers, terms, insurers, amounts and coverages; and (ii) all bonds, indemnity agreements, and other agreements of suretyship made for or held by Seller, including a brief description of the character of the bond or agreement and the name of the surety or indemnifying party.  Seller has not as of the Closing Date received any written notice from any insurance company canceling or materially amending any of the Insurance Policies, or failed to give any required notice or present any claim which is still outstanding under any of the Insurance Policies.

Section 5.36 <u>Proprietary Rights</u>.  Seller or Owner presently owns, possesses, or lawfully uses in connection with the Business, all know-how, trade secrets, trademarks, service marks, trade names, copyrights, franchises, licenses, patents and similar intangible rights necessary in the operation of the Business (collectively, the "Proprietary Rights"), each of which is set forth on the attached Schedule 5.26 (including but not limited to all software that is used by the Business). To the Seller's knowledge, as of the Closing Date, Seller did not, in the conduct of the Business of Seller, infringe on or otherwise act adversely to the rights of any individual or entity under or in respect of any Proprietary Rights.  To the Seller's knowledge, as of the Closing Date, the Seller was not obligated or under any liability whatsoever to make any payments by way of royalties, fees, or otherwise to any owner or licensee of, or other claimant to, any patent, trademark, trade name, copyright, or other intangible asset on account of Seller's ownership of the Basic Assets or the operation of the Business.  As of the Closing Date, there were no pending, or to Seller's knowledge, threatened claims against Seller or any of its employees alleging that any of Seller's Basic Assets or the Business infringes or conflicts with the Proprietary Rights of others.

Section 5.37 <u>Post-Closing Operations</u>.  For the avoidance of doubt, Seller agrees that it will not operate the Business, or similar medical practice, following the Closing Date.  This representation shall survive Closing.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller on the date hereof and on the Closing Date that:

Section 6.1 <u>Status</u>.  Purchaser is a limited liability company duly formed and subsisting under the laws of the State of New York and has full power and authority to own its properties and to carry on the business presently conducted by it.

Section 6.2    <u>Authority; Effective Agreement</u>.  Purchaser has the requisite power and authority to execute and deliver this Agreement and, subject to the Sale Order, to perform its obligations under this Agreement and the Purchase Documents to which it is a party, and to consummate the transactions contemplated herein and therein.  Purchaser has taken all actions required by Purchaser to authorize the execution, delivery and performance of the Purchase Documents and the consummation of the transactions contemplated thereby.  This Agreement has been duly and validly executed and delivered by Purchaser and constitutes a legal, valid and binding obligation of Purchaser enforceable against Purchaser in accordance with its terms.

Section 6.3    <u>No Violation; Consents</u>.

(a)The execution and delivery by Purchaser of this Agreement and the other Purchase Documents to which it is a party and the consummation of the transactions contemplated hereby and thereby do not and will not (i) violate any provision of the constituent documents of Purchaser, (ii) conflict with, require the consent of a third party under, violate, result in the breach of, constitute a default under, or give rise to any right of acceleration, cancellation or termination of any material right or obligation of Purchaser under any material agreement or other instrument to which Purchaser is a party or by which Purchaser or any of its properties or assets are bound, (iii) violate any Order of any Governmental Authority to which Purchaser is bound or subject, or (iv) violate any Applicable Law.(b) No Order or Permit issued by, or declaration or filing with, or notification to, or waiver or consent from, any Governmental Authority is required on the part of Purchaser in connection with the execution and delivery of this Agreement, or the compliance or performance by Purchaser with any of the provisions contained in this Agreement.

Section 6.4    <u>Financial Capability</u>.  Purchaser will have on the Closing Date sufficient unrestricted cash and cash equivalents and/or existing credit facilities with sufficient borrowing capacity thereunder (and, as of the date of this Agreement has provided Sellers with satisfactory evidence thereof) to purchase the Acquired Assets, pay and otherwise satisfy the Purchase Consideration in full, and to consummate the transactions contemplated by this Agreement, including the payment of all fees and expenses contemplated hereunder.

Section 6.5    <u>Brokers or Finders</u>.  No agent, broker, person or firm acting on behalf of Purchaser or any of its Affiliates is, or will be, entitled to any commission, broker's or finder's fees from any party, or from any Affiliate of any party, in connection with any of the transactions contemplated by this Agreement.

Section 6.6    <u>Litigation or Proceedings</u>.  There is no litigation or other proceeding pending, or, to the knowledge of Purchaser, threatened, against Purchaser that could reasonably be expected to affect adversely Purchaser's ability to consummate the transactions contemplated by this Agreement.

Section 6.7    <u>Omitted</u>.

Section 6.8    <u>"As Is" Transaction</u>.  Purchaser hereby acknowledges and agrees that, except as otherwise expressly provided in this Agreement, Seller makes no representations or warranties whatsoever, express or implied, with respect to any matter relating to the Business or

to the Acquired Assets, including, income to be derived or expenses to be incurred in connection with the Business or the Acquired Assets, the physical condition of any personal or real property comprising a part of the Acquired Assets or the value of the Acquired Assets (or any portion thereof).  Without in any way limiting the foregoing, Seller hereby disclaims any warranty (express or implied) of merchantability or fitness for any particular purpose as to any portion of the Acquired Assets.  Purchaser further acknowledges that it has had an opportunity to conduct an independent inspection and investigation of the physical condition of the Acquired Assets, made available by Seller.  Accordingly, if the Closing occurs, Purchaser will accept the Acquired Assets at the Closing Date "AS IS," "WHERE IS," and "WITH ALL FAULTS," subject to the provisions of this Agreement and the Sale Order providing that the sale of the Acquired Assets is free and clear of all Liens and Claims. Without in any way limiting the foregoing, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES SPECIFICALLY SET FORTH IN THIS AGREEMENT, SELLER HAS PROVIDED NO REPRESENTATIONS OR WARRANTIES AND SPECIFICALLY DISCLAIMS ALL SUCH REPRESENTATIONS AND WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED, TO ANY IMPLIED WARRANTY OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

## ARTICLE VII
## FURTHER COVENANTS AND AGREEMENTS

Section 7.1    Collection of Accounts Receivable.  Purchaser agrees to use reasonable business efforts to collect Seller's Accounts Receivable. Purchaser further agrees, at least monthly, to account to Seller receipt of payment on any of Seller's Accounts Receivable and to remit and turnover to Seller 72.5% of any collections on Seller's Accounts Receivable.

Section 7.2. From and after the date of this Agreement and until the Closing Date, except as otherwise consented to by Purchaser in writing:

(a) The Business will not acquire or dispose of any fixed assets (other than disposing of obsolete or worn out fixed assets which are no longer usable), make any capital expenditures, or institute, amend, or terminate any employment benefit plan, or enter into, amend, or terminate any material or long-term contract without the written consent of Purchaser, which consent Purchaser shall not unreasonably withhold or delay; provided, however that the consent of Purchaser shall not be required for capital expenditures of an emergency nature required to maintain or operate the Business.

(b) Seller shall use best efforts to maintain and keep the Acquired Assets and the Property in good condition and working order, including making necessary repairs and replacements, ordinary wear and tear, depreciation, and casualty excepted.

(c) Seller shall use its best efforts to maintain and preserve intact the business organization relating to the Business, to retain adequate staffing of the Business and to maintain the Business's relationship with suppliers, customers, and others having business relations with the Business so that they will be preserved for Purchaser on the Closing Date.

-19-

(d) Seller, and the operations of the Business, shall comply with all state and municipal laws, ordinances, rules, regulations and orders or notices of violations relating to the Business and the Property.

(e) Seller shall comply with all terms, conditions and provisions of all leases, mortgage(s), agreements, insurance policies and other contractual arrangements referred to herein in all material respects and make all payments due thereunder and suffer no default thereunder.

(f) Seller shall promptly furnish Purchaser with such information and accounting with respect to the operation and maintenance of the Business and the Property as Purchaser may reasonably request provided Seller shall not be required to prepare and furnish to Purchaser any such information or accounting not maintained or prepared in the ordinary course of Seller's businesses.  Seller shall afford Purchaser, and its agents, reasonable access to the Business, the Property and all books and records relating thereto during normal business hours upon reasonable advance notice and request.

(g) Seller shall cause to be maintained in force, fire and extended coverage insurance on the Property and public liability insurance with respect to damage or injury to person or property occurring at the Property or relating to the Business in at least such amounts as are maintained by Seller on the date of this Agreement.  Seller represents that it currently carries the insurance set forth in Schedule 5.16 annexed hereto.

Section 7.3  Seller shall only enter into or renew agreements or contracts in the normal course of business.  Without Purchaser's prior written consent, Seller shall not enter into or renew an agreement or contract without Bankruptcy Court approval.

Section 7.4    Cooperation.

(a)     Purchaser and Seller agree to execute and deliver all other instruments and take all such other actions that either party may reasonably request from time to time, before or after Closing and without payment of further consideration, to effectuate the transactions provided in this Agreement or any of the Purchase Documents and to confer to the parties hereto the benefits intended by such transactions.

(b)     Seller and Purchaser reasonably and in good faith shall cooperate fully with each other in preparing and filing all Tax Returns relating to the Business and the Acquired Assets, including maintaining and making available to each other all records of Seller to the extent necessary in connection with the preparation and filing of such Tax Returns or any audit, litigation, or other proceeding with respect to Taxes.  Such cooperation shall include the retention and (upon the other party's request) the provision of records and information that are reasonably relevant to any such audit, litigation, or other proceeding and making employees available on a mutually convenient basis to provide additional information and explanation any material provided hereunder.  Seller agrees to turn over to Purchaser all books and records with respect to Tax matters pertinent to the Business or any Acquired Assets relating to any taxable period beginning before the Closing Date; provided that Seller may retain a copy of same.  Seller and Purchaser further agree, upon request, to use reasonable best efforts to obtain any certificate

or other document from any Governmental Entity or any other Person as may be necessary to mitigate, reduce, or eliminate any Tax, fee, or other charge that could be imposed in connection with the transactions contemplated hereby.

(c)      Seller shall promptly forward any mail or other communications relating to the Business or the Business or the Acquired Assets or the Assumed Liabilities that are received by Seller after the Closing.

Section 7.5      Intentionally Omitted

Section 7.6      <u>Litigation</u>.  From the date hereof through the Closing Date, Seller shall promptly notify Purchaser of any claims, which after the date hereof are threatened or commenced against Seller or against any manager, employee, consultant, agent, equity holder or other representative of Seller with respect to the Acquired Assets or the Business.

Section 7.7      <u>Disclosure to Parties</u>.  If any of the parties hereto becomes aware, prior to the Closing Date, that any of its representations, warranties, covenants or other agreements is inaccurate or incapable of being performed in any material respect, such party shall promptly give written notice of such inaccuracy or incapability to the other party; <u>provided</u>, <u>however</u>, that nothing contained in this <u>Section 7.7</u> shall relieve the party bound by such representation, warranty, covenant or other agreement from complying with such representation, warranty, covenant or other agreement.

Section 7.8      <u>Bankruptcy Matters</u>.  In addition to the obligations of Seller under Article X, Seller and Purchaser shall use reasonable best efforts and proceed diligently and in good faith to, as promptly as practicable, obtain all authorizations, consents, orders and approvals of the Bankruptcy Court necessary for the consummation of the transactions contemplated by this Agreement, including, but not limited to, those set forth in Article X.

Section 7.9      Intentionally Omitted

Section 7.10     Intentionally Omitted

Section 7.11     <u>Post Closing Cooperation</u>.    To facilitate the orderly transition of ownership of the Acquired Assets, each party shall assist the other party with operating and transitional issues by providing information reasonably requested by such other party regarding the business and operations of Seller prior to the date hereof.

Section 7.12     <u>Collections</u>.  If Seller (or its administrators) shall receive any monies on account of the Acquired Assets, it shall hold all such monies in trust for the sole benefit of the Purchaser.  Within five Business Days after receipt thereof, Seller (or its administrators) shall cause the transfer and delivery to the Purchaser of any monies or other property which Seller (or its administrators) may receive after the Closing Date with respect of the Acquired Assets.  If Purchaser (or any affiliate of Purchaser) shall receive any monies on account of the Excluded Assets, it shall hold all such monies in trust for the sole benefit of the Seller.  Within five Business Days after receipt thereof, Purchaser (or any affiliate of Purchaser) shall cause the transfer and delivery to the Seller of any monies or other property which Purchaser (or any affiliate of Purchaser) may receive after the Closing Date with respect any Excluded Assets.

Section 7.13    Notice to Third Parties.    On the Closing Date, Seller shall execute and deliver to the Purchaser for use by the Purchaser with respect to any third party that currently has any rights whatsoever in or to the Acquired Assets, anywhere throughout the world, letters prepared jointly by, and mutually acceptable to, the Purchaser and Seller advising that (a) effective as at the Closing Date, the Purchaser owns Seller's interests in or to the Acquired Assets and (b) the Purchaser is entitled to receive all moneys, payments, receipts, revenues or income derived therefrom in accordance with this Agreement; and requesting that thereafter they render all required statements and activity reports and make payments of one hundred (100%) percent of all sums thereafter otherwise due in respect of any period, whether before or after Closing to Purchaser in accordance with this Agreement, and provide copies of all notices, claims or other correspondence, directly to the Purchaser.

Section 7.14    Breakup Fee.    In the event that the Bankruptcy Court enters a Final Order approving an Alternate Transaction, then Purchaser shall be entitled to, at the consummation of an Alternate Transaction (or in the case of a plan of reorganization or liquidation that is an Alternate Transaction upon confirmation of such plan of reorganization or liquidation), $15,000 (the "**Breakup Fee**").    The Breakup Fee provided for by this Section is intended to cover opportunity costs incurred by Purchaser in pursuing and negotiating this Agreement and the transactions contemplated hereby, and is considered by the Parties to be reasonable for such purposes.    The Breakup Fee shall be paid from the first sale proceeds of an Alternate Transaction.    The claims of Purchaser to the Breakup Fee shall constitute an administrative expense against the Seller's bankruptcy estate under the applicable provisions of the Bankruptcy Code.

## ARTICLE VIII
## CONDITIONS TO OBLIGATIONS OF PURCHASER

The obligations of Purchaser to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions, any or all of which Purchaser may waive in writing:

Section 8.1    Representations and Warranties.    Each of the representations and warranties of Seller set forth in this Agreement and any exhibit or schedule hereto shall be true and correct in all material respects on and as of the Closing Date (except for the representations and warranties which speak as of a specific date or time, which representations and warranties need only be true and correct as of such date or time).

Section 8.2    Covenants and Agreements.    Seller shall have performed and complied in all material respects with all of its covenants and agreements contained in this Agreement which are required to be performed or complied with on or prior to the Closing Date.

Section 8.3    Satisfaction of Certain Obligations.    Seller shall have satisfied the conditions of Sections 365 of the Bankruptcy Code to the extent necessary to permit the rejection of the Contracts.

Section 8.4    <u>Bankruptcy Matters</u>.  All authorizations, consents, orders and approvals of the Bankruptcy Court necessary for the consummation of the transactions contemplated by this Agreement shall have been obtained, including, but not limited to, those set forth in Article X; and Purchaser shall have received from the Bankruptcy Court all other orders, approvals and consents required to transfer the Acquired Assets and to consummate the transactions contemplated by this Agreement.

Section 8.5    <u>No Injunctions</u>.  No Governmental Entity shall have enacted, issued, promulgated, enforced or entered any statute, rule, regulation, judgment, decree, injunction or other order that is in effect on the Closing Date and prohibits the consummation of the transactions contemplated hereby.  No action, suit, or proceeding shall be pending or threatened before any court or quasi-judicial or administrative agency of any federal, state, local, or foreign jurisdiction or before any arbitrator wherein an unfavorable injunction, judgment, order, decree, ruling, or charge would (A) prevent consummation of any of the transactions contemplated by this Agreement, (B) cause any of the transactions contemplated by this Agreement to be rescinded following consummation, or (C) affect adversely the right of the Purchaser to own the Acquired Assets or to operate the Business.

Section 8.6    <u>Deliveries</u>.  All documents required to be delivered by Seller at or prior to Closing shall have been delivered to Purchaser at Closing, including, without limitation, those contemplated by <u>Section 4.2.</u>

Section 8.7    <u>Real Property Lease</u>.  The Purchaser and the Landlord shall have executed a new lease for the Real Property satisfactory to the Purchaser and Landlord, with the effectiveness of such lease conditioned on approval of the Sale Motion.

Section 8.8    <u>Employment Agreement</u>.    The Purchaser and the Owner shall have executed the Employment Agreement, with the effectiveness of the Employment Agreement conditioned on approval of the Sale Motion.

## ARTICLE IX
## CONDITIONS TO OBLIGATIONS OF SELLER

The obligations of Seller to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions, any or all of which Seller may waive in writing:

Section 9.1    <u>Representations and Warranties</u>.    Each of the representations and warranties of Purchaser set forth in this Agreement and any exhibit hereto shall be true and correct in all material respects on and as of the Closing Date (except for the representations and warranties which speak as of a specific date or time, which representations and warranties need only be true and correct as of such date or time).

Section 9.2    <u>Covenants and Agreements</u>.    Purchaser shall have performed and complied in all material respects with all of its covenants and agreements contained in this Agreement which are required to be performed or complied with on or prior to the Closing Date.

Section 9.3    <u>Bankruptcy Matters</u>.  All authorizations, consents, orders and approvals of the Bankruptcy Court necessary for the consummation of the transactions contemplated by this Agreement shall have been obtained, including, but not limited to, those set forth in Article X; and Seller shall have received from the Bankruptcy Court all other orders, approvals and consents required to transfer the Acquired Assets and to consummate the transactions contemplated by this Agreement.

Section 9.4    <u>No Injunctions</u>.  No Governmental Entity shall have enacted, issued, promulgated, enforced or entered any statute, rule, regulation, judgment, decree, injunction or other order that is in effect on the Closing Date and prohibits the consummation of the transactions contemplated hereby. No action, suit, or proceeding shall be pending or threatened before any court or quasi-judicial or administrative agency of any federal, state, local, or foreign jurisdiction or before any arbitrator wherein an unfavorable injunction, judgment, order, decree, ruling, or charge would (A) prevent consummation of any of the transactions contemplated by this Agreement, or (B) cause any of the transactions contemplated by this Agreement to be rescinded following consummation

Section 9.5    <u>Deliveries</u>.  All documents required to be delivered by Purchaser at or prior to Closing shall have been delivered to Seller at Closing, including, without limitation, those contemplated by <u>Section 4.2</u>.

Section 9.6    <u>Entry into Real Property Lease</u>.  Purchaser shall have entered into a new lease with Landlord for the Real Property subject to the conditions in Section 3.3 within ninety (90) days of entry of the Sale Order.

## ARTICLE X
## BANKRUPTCY CONDITIONS

The obligations of each party to consummate the transactions contemplated hereby shall be subject to the fulfillment or waiver of each of the following conditions:

Section 10.1    <u>Sale Order</u>.  The entry by the Bankruptcy Court, after a hearing before the Bankruptcy Court to consider the sale of the Acquired Assets (the "**Sale Hearing**") of an order (the "**Sale Order**") in favor of Purchaser, which shall be in form attached hereto as **Exhibit C** except for those modifications agreed to by the Purchaser in writing, and which shall approve the transactions contemplated by this Agreement including, but not limited to the sale of all of the Acquired Assets free and clear of all Claims and Encumbrances and shall, without limitation, contain findings of fact and conclusions of law that:  (a) Purchaser is a good faith purchaser entitled to the protections of Section 363(m) of the Bankruptcy Code and the sale contemplated by this Agreement does not violate and is not subject to avoidance under Section 363(n) of the Bankruptcy Code; (b) all of the requirements of Sections 363 and 365 of the Bankruptcy Code have been satisfied; (c) the Acquired Assets are being sold free and clear of all Claims and Encumbrances; (d) any Claims and Encumbrances on the Acquired Assets shall attach to the proceeds received by Seller pursuant to this Agreement to the same extent, and with the same validity, priority, perfection and enforceability, as such Claims and Encumbrances had with respect to the Acquired Assets; (e) notice of the hearing on the transactions contemplated by this Agreement (i) was given in accordance with the applicable provisions of the Bankruptcy Code

and the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and (ii) constitutes such notice as is appropriate under the particular circumstances and in accordance with the Bankruptcy Code and applicable law; (f) neither Purchaser nor its designees shall be considered successors of Seller or any of Seller's Affiliates and none of Purchaser, any of Purchaser's Affiliates or any designee shall have any liability for any debts, liabilities or obligations of, or claims against Seller or any of Seller's Affiliates, except as expressly assumed in writing by Purchaser pursuant to this Agreement; (g) if the Bankruptcy Court determines that the law so permits, the transfer of the Acquired Assets shall not be subject to the imposition or payment of any transfer, stamp or similar tax, and there shall not be in effect any preliminary or permanent injunction, stay, order, decree or ruling limiting the effect of the Sale Order by a court of competent jurisdiction; and (h) provisions for the Bankruptcy Court's retention of jurisdiction over matters arising out of or related to this Agreement and the transactions contemplated hereby.

Section 10.2    <u>Higher and Better Offers</u>.  The sale of the Acquired Assets is SUBJECT TO HIGHER AND BETTER OFFERS by a competing offeror (the "**Competing Offeror**") made by the objection deadline (the "**Objection Deadline**") specified in the notice attached to the Sale Motion.  If the Seller receives an offer from a Competing Offeror by the Objection Deadline, the Seller will request approval of the Bankruptcy Court to conduct an auction, or, alternatively, submit bidding procedures specifying the process for submitting bids and conducting an auction, subject to Bankruptcy Court approval.

Section 10.3    <u>Final Order</u>.  The Sale Order in the form attached hereto as <u>Exhibit C</u>, except for those modifications agreed to by the Purchaser in writing, shall have become a Final Order; <u>provided</u>, <u>however</u>, that this condition may be waived in writing and signed by both parties hereto.  Seller shall seek entry of an order waiving any stay requirement under, *inter alia*, Federal Rules of Bankruptcy Procedure 6004 and 6006.

## ARTICLE XI
## TERMINATION OF AGREEMENT

Section 11.1    <u>Termination</u>.    This Agreement may be terminated by written notice promptly given to the other party hereto, at any time prior to the Closing Date:

(a)    by mutual consent of Purchaser and Seller;

(b)    by either Purchaser or Seller, if any permanent injunction or other order of any Governmental Entity which prevents the consummation of the transactions contemplated hereby shall have become final and non-appealable;

(c)    by either Purchaser or Seller, if the Closing has not occurred by the date which is ninety (90) days after the date of entry of the Sale Order;

(d)    by either Purchaser or Seller, if the Bankruptcy Court authorizes or approves an Alternative Transaction or an Alternative Transaction is consummated;

(e)    by Purchaser, upon the voluntary or involuntary dismissal of the Bankruptcy Case;

(f)    by Purchaser, so long as Purchaser is not then in breach of its obligations hereunder in any material respect as evidenced by any notice of breach, if there has been a material breach by Seller of any of its representations, warranties, covenants or other agreements set forth herein, which breach is not curable, or if curable, is not cured within three (3) days after notice of such breach is given by Purchaser to Seller,;

(g)    by Purchaser, if the Sale Order does not become a Final Order in the form attached hereto as Exhibit C, except for any modifications agreed to in writing by the Purchaser;

(h)    by Seller, so long as Seller is not then in breach of its obligations under this Agreement in any material respect, if there has been a material breach by Purchaser of any of its representations, warranties, covenants or other agreements set forth herein, which breach is not curable, or if curable, is not cured within three (3) days after notice of such breach is given by Seller to Purchaser;

(i)    by either party if the Sale Order is not entered within three (3) months following the Sale Hearing; or

(j)    by either party if the Employment Agreement or Real Property Lease are not duly executed within three (3) months following the Sale Hearing.

Section 11.2    Effect of Termination.    Subject to provisions of Section 11.3, If this Agreement is validly terminated pursuant to Section 11.1(a), (b), (c), (e), (f), (g), (h), (i), or (j), this Agreement shall become wholly void and of no further force and effect without liability to Purchaser or Seller, or any of their respective Representatives, and each shall be fully released and discharged from any liability or obligation under or resulting from this Agreement and no party shall have any other remedy or cause of action under or relating to this Agreement or any Applicable Law.    The same shall be true if this Agreement is terminated pursuant to Section 12.1(d), except that Purchaser shall be entitled to the Breakup Fee set forth herein.

Section 11.3    Refund of Deposit/Liquidated Damages. Purchaser shall forfeit the Deposit if this Agreement is terminated pursuant to Section 11.2(h). Such forfeiture (the "Liquidated Damages") shall be the sole and exclusive remedy available to Seller in the event of any breach of this Agreement by Purchaser.  If this Agreement is terminated for any other reason (or if Purchaser is not the successful purchaser (the "Successful Purchaser")) except pursuant to Section 11.2(h), the entire Deposit shall be returned to Purchaser within seven (7) days of such termination or after the entry of an order approving the sale of the Acquired Assets to the Successful Purchaser, as the case may be.

## ARTICLE XII
## SURVIVAL OF REPRESENTATIONS AND WARRANTIES; SURVIVAL OF COVENANTS; SELLER'S REPRESENTATIVE

Section 12.1    Survival of Representations and Warranties.    The representations and warranties of each party set forth herein shall not survive the Closing and consummation of the transactions contemplated hereby, except for the representation listed in Section 5.37.

Section 12.2    <u>Survival of Covenants</u>.  The covenants and agreements to be performed by the parties set forth herein shall survive the Closing and consummation of the transactions contemplated hereby until complied with in full.

Section 12.3    <u>Investigations</u>.    Notwithstanding  any  right  of  either  party  hereto  to investigate  the  affairs  of  the  other  party  hereto  and  notwithstanding  any  knowledge  of  facts determined or determinable by such party pursuant to such investigation or right of investigation, such  party  has  the  right  to  rely  fully  upon  the  representations,  warranties,  covenants  and agreements of the other party herein contained in this Agreement, any Purchase Document or in any certificate, schedule or exhibit delivered pursuant to this Agreement.

**ARTICLE XIII**
**GENERAL**

Section 13.1    <u>Notices</u>.    All  notices  and  other  communications  hereunder  shall  be  in writing  and  shall  be  sent  by  certified  mail,  postage  prepaid,  return  receipt  requested;  or  by  an overnight  express  courier  service  that  provides  written  confirmation  of  delivery,  addressed  as follows:

| | |
|---|---|
| If to Seller: | Roxanne Gail Carfora, D.O., P.C. |
| | 694 Motor Parkway |
| | Hauppauge, New York 11788 |
| | |
| With a copy to: | Klestadt Winters Jureller Southard & Stevens, LLP |
| | 200 West 41st St., 17th Fl. |
| | New York, New York 10036 |
| | Attn: Tracy L. Klestadt |
| | |
| If to Purchaser: | Long Island Practice Management |
| | 1070 Old Country Road |
| | Plainview, NY 11803 |
| | Attention:  Dr. David Kavesteen |
| | |
| With a copy to: | Raymond Iryami Law Firm, P.C. |
| | 305 Madison Ave., 46th Fl. |
| | New York, New York 10165 |
| | Attn: Raymond Iryami |

Any party may change its address for receiving notice by giving notice of a new address in  the  manner  provided  herein.    Any  notice  so  given,  shall  be  deemed  to  be  delivered  on  the second Business Day after the same is deposited in the United States mail, on the next Business Day if sent by overnight courier.

Section 13.2    <u>Entire Agreement</u>.  This Agreement and the other Purchase Documents, together with exhibits and schedules attached to this Agreement, constitute the entire agreement between the parties pertaining to this subject matter and supersede all prior or contemporaneous

agreements and understandings of the parties relating to the same.  This Agreement may be amended only in writing signed by the parties hereto.

Section 13.3    <u>Severability</u>.    If any term or provision of this Agreement or any application thereof shall be invalid or unenforceable, the remainder of this Agreement and any other application of such term or provision shall not be affected thereby.

Section 13.4    <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to conflicts of law principles.

Section 13.5    <u>JURISDICTION, WAIVER OF JURY TRIAL.</u>

(a)    THE BANKRUPTCY COURT (AS DEFINED HEREIN) WILL HAVE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER PURCHASE DOCUMENT; PROVIDED, HOWEVER, THAT IF THE BANKRUPTCY COURT IS UNWILLING OR UNABLE TO HEAR ANY SUCH DISPUTE, THE SUPREME COURT OF THE STATE OF NEW YORK IN NASSAU COUNTY AND THE UNITED STATES OF AMERICA DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK WILL HAVE SOLE AND EXCLUSIVE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN THE PARTIES, WHETHER IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER PURCHASE DOCUMENT.   ANY PARTY MAKING AN INITIAL FILING IN SUPREME COURT MUST DESIGNATE THE CASE OF ASSIGNMENT TO THE COMMERCIAL DIVISION OF THAT COURT.

(b)    EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 13.6    <u>Waiver</u>.  Any of the terms or conditions of this Agreement may be waived at any time by the party entitled to the benefit thereof, but only by written notice signed by the party waiving such terms or conditions.

Section 13.7    <u>Expenses</u>.  Except as expressly provided herein, Purchaser and Seller shall each bear their respective expenses relating to or arising out of this Agreement, including, but not limited to, fees for attorneys, accountants and other advisors.

Section 13.8    <u>Assignability; Binding Effect</u>.  This Agreement may not be assigned by Seller without the prior written consent of Purchaser.  Seller may assign its rights and obligations under this Agreement to any of its Affiliates, including a subsidiary formed for purposes of consummating the transactions contemplated by this Agreement, without the prior consent of the Seller.  Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

Section 13.9    <u>Counterpart Execution</u>.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall

constitute one and the same instrument.  Any counterpart signature page delivered by facsimile or other electronic transmission shall be deemed to be and have the same force and effect as an originally executed signature page.  This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the parties reflected hereon as the signatories.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**IN WITNESS WHEREOF**, the parties hereto have caused a duly authorized representative to execute this Agreement on the day and year first above written.

**ROXANNE GAIL CARFORA, D.O., P.C.**


By:    */s/ Dr. Roxanne G. Carfora*
Name:  Dr. Roxanne G. Carfora
Title:    Owner


**LONG ISLAND PRACTICE MANAGEMENT**


By:    */s/ Dr. David Kavesteen*
Name:  Dr. David Kavesteen
Title:  President

**<u>Disclosure Schedules to Asset Purchase Agreement</u>**

**Schedule 2.2(a)**

**Excluded Contracts**

**Real Property and Personal Property:**

- Lease for premises located at 694 Motor Parkway, Hauppauge, New York, with landlord Quadrangle Properties, LLC.

**Leases with employees (none), vendors or independent contractors:**

Biohazardous waste management lease with Stericycle Inc.

Copier lease with Shore Office Systems

Laser machine lease with Financial Pacific Leasing, Inc.

Medical Equipment Lease – Christine Savarese has lease with Complete Management Strategies, Inc., and the Debtor has orally agreed to pay Ms. Savarese all amounts due.

IPACS- Computer IT support/security

Optimum- Phone & Computer

MD Everywhere –Billing Company

Premium Assignment Corporation-Malpractice- Monthly Finance Payment

**Any Agreements with Insurance Companies or Third Party Payors:**

     **Insurance Coverage:**

| Policy Type | Insured | Insurer | Policy Number | Term |
|---|---|---|---|---|
| Physicians' Prof Liability | Roxanne Gail Carfora, DO, PC | Doctors and Surgeons National RRG | 15-010460-04 | 10/28/2015 – 10/28/2016 |
| Disability Insurance | Roxanne G. Carfora DO PC | ShelterPoint Life Insurance Company | DBL467723 | 06/05/2015 – 06/04/2016 |
| Workers' Compensation | Carfora Family Medicine | The Hartford | 02 WEC CQ0397 | 03/14/15 – 03/14/16 |
| Office Liability | Roxanne Gail Carfora DO PC | State Farm Insurance | | 12/01/15- 12/01/16 |
| Medical Insurance | Roxanne Gail Carfora DO PC | Office Health Insurance | RG9375 | 04/01/14- 04/01/16 |

**Insurance Companies that the Seller has Agreements with/Third Party Payors:**

Aetna Insurance Company

Blue Cross/Blue Shield

Cigna Healthcare

Empire Plan

Health Republic

Magnacare

Medicare

Multiplan

Oscar

Oxford

United Healthcare (not Community Plan)

1199

**Schedule 2.2(g)**

**Personal Property Not Being Sold**

| <u>CHECK OUT/VITAMIN</u> | <u>AESTHETIC ROOM</u> |
|---|---|
| HP Computer | Bed & Head Rest |
| Fijitsu Scanner | White Credenza |
| Brother Printer | 2- Lamps |
| UAccept POS System | White Cabinet |
| All Xymogen Products | Towel Warmer |
| All Life Extension Products | Icarus Vapor Machine |
| All Brochures & Product Bags | Skin Scope Machine |
| Desk & Chair | All Topix Skincare Products |
| Black File Cabinet | All Acupuncture Supplies |
| | Blankets |
| <u>NUTRITION ROOM</u> | Bed- Dr. Carfora's Office |
| Acer Computer | Black Stand |
| Shelves on Wall | Radio |
| Metobolic Machine & Metobolic Tubes | <u>RENEE'S OFFICE</u> |
| Zyto Machine | HP Computer & Brother Printer |
| Scale | White Supply Cabinet |
| Desk & Chair | Shredder |
| Black Credenza | <u>TRANQUILITY ROOM</u> |
| Black File Cabinet | Bed , Laser Machine & 2 Lamp |
| HP Printer | All Botox & Juvederm Supply |

**Schedule 5.8**

**Pending or Threatened Litigation**

**<u>Pending Lawsuits</u>**

| Case Name and Number | Allegations and Status |
|---|---|
| **Steven Selter, M.D. v. Roxanne Gail Carfora, D.O., P.C.** *et al.* **(Index No. 606339/2015)** | Plaintiff seeks damages based upon alleged breach of employment agreement with the Debtor, violations under the NYS Labor Laws, and indemnification and attorneys' Fee.  The parties are currently in the discovery phase of litigation. |
| **KBD Medical Management Inc. v. Roxanne Gail Carfora, D.O., P.C.** *et al.* **(Index No. 067558/2014)** | Case dismissed on October 15, 2015. |
| **Tommasino v. Ageless 360 Medical Group,** *et al.* **(Index No. 018191/2014)** | Plaintiff seeks damages stemming from alleged breach of asset purchase agreement and employment agreement.  Upon information and belief this proceeding has been stayed by the Court. |
| **L.P.B. of Wading River Inc. v. Roxanne Carfora D.O. d/b/a Ageless 360** *et al.* **(Index No. 21942/2014)** | Plaintiff seeks damages against Defendants for alleged breach of lease agreement.  Case is pending in District Court. |
| **Medical Management Corp. v. Roxanne G. Carfora, D.O., P.C.,** *et al.* **(Index No. 966/2015)** | Answer has been filed, but no preliminary conference scheduled yet. |
| **Vasquez, individually and as Administrator of the Estate of Clara Luz Cahill v. Roxanne G. Carfora, D.O., P.C.** *et al* **(Index No. 67055/2014)** | Plaintiff seeks damages on account of negligence and medical malpractice among others. This case is pending but Debtor believes it has a full defense. |
| **134 S. Central Ave. Corp. v. Roxanne Gail Carfora (Index No. 610981-2015)** | Action to collect on promissory note. |

**<u>Threatened Lawsuits</u>**

| Plaintiff | Allegations |
|---|---|
| **Kirschenbaum & Kirschenbaum, PC** | Draft lawsuit sent alleging, among other things failure to pay balance due for legal services rendered |
| **Source Ventures LLC** | Notice and demand letter sent re: Debtor's failure to make payment on October 1, 2015 under settlement agreement between Debtor and Source Ventures, LLC |

**Schedule 5.13**

**Employees**

| Name | Job Title | Hourly Rate/Salary | Change in Compensation Since January 1, 2015 | Accrued Vacation | Other Accrued Leave |
|------|-----------|--------------------|---------------------------------------------|------------------|---------------------|
| Stephen Miro | Physicians Assistant | 4,038.46 bi weekly | None. | 4 weeks | None |
| Kathryn Rogan | Physicians Assistant | 45.00 per hour | None | | None |
| Jessica Mangianacia | Physicians Assistant | 3,077.00 bi weekly | None | 2 weeks | None |
| Gayle Couleas | Nurse Practitioner | 50.00 per hour/ 60.00 per home visit | Raise | | None |
| Danielle Augustine | Medical Assistant | 20.00 per hour | Raise | 3 weeks | None |
| Kimberly Walsh | Medical Assistant | 15.00 per hour | Raise | 1 week | None |
| Kimberly Szollosi | Medical Assistant | 14.00 per hour | Raise | 2 weeks | None |
| Merice German | Medical Assistant | 13.00 per hour | None | | None |
| Ashlyn Verdi | Reception Manager | 16.00 per hour | None | 2 weeks | None |
| Angelica Strippoli | Receptionist | 15.00 per hour | None | 2 weeks | None |
| Courtney Staib | Receptionist/Authorization | 16.00 per hour | None | 2 weeks | None |
| Jennifer Costa | Nutritional Consultant | 20.00 per hour/ 10.00 per consult fee | None | | None |
| Frank Carfora | Office Assistant | 1,100.00 bi weekly | Raise | 2 weeks | None |
| Renee Sarnelli | Office Manager | 1,576.92 bi weekly | None | 3 weeks | None |

**Schedule 5.16**

**All Insurance Policies Maintained by the Seller**

| Policy Type | Insured | Insurer | Policy Number | Term |
|---|---|---|---|---|
| Physicians' Prof Liability | Roxanne Gail Carfora, DO, PC | Doctors and Surgeons National RRG | 15-010460-04 | 10/28/2015 – 10/28/2016 |
| Disability Insurance | Roxanne G. Carfora DO PC | ShelterPoint Life Insurance Company | DBL467723 | 06/05/2015 – 06/04/2016 |
| Workers' Compensation | Carfora Family Medicine | The Hartford | 02 WEC CQ0397 | 03/14/15 – 03/14/16 |
| Office Liability | Roxanne Gail Carfora DO PC | State Farm Insurance | | 12/01/15- 12/01/16 |
| Medical Insurance | Roxanne Gail Carfora DO PC | Office Health Insurance | RG9375 | 04/01/14- 04/01/16 |

**Schedule 5.18**

**Seller is a Provider under the below Health Plans:**

Aetna Insurance Company

Blue Cross/Blue Shield

Cigna Healthcare

Empire Plan

Health Republic

Magnacare

Medicare

Multiplan

Oscar

Oxford

United Healthcare (not Community Plan)

1199

**Schedule 5.20**

**Leased Equipment Used by the Business**

Biohazardous waste management lease with Stericycle Inc.

Copier lease with Shore Office Systems

Laser machine lease with Financial Pacific Leasing, Inc.

Medical Equipment Lease – Christine Savarese has lease with Complete Management Strategies, Inc., and the Debtor has orally agreed to pay Ms. Savarese all amounts due.

IPACS- Computer IT support/security

Optimum- Phone & Computer

MD Everywhere –Billing Company

Premium Assignment Corporation-Malpractice- Monthly Finance Payment

**Section 5.22**

**Audits or Investigations Relating to Business during past (7) years**

Health insurance plans give Audits on electronic records periodically.

**Schedule 5.29(a)**

**Compensation**

| Name | Position | Hourly Rate/Salary | Annual Base Salary (if salaried) |
|------|----------|--------------------|---------------------------------|
| Stephen Miro | Physicians Assistant | 4,038.46 bi weekly | |
| Kathryn Rogan | Physicians Assistant | 45.00 per hour | N/A |
| Jessica Mangianacia | Physicians Assistant | 3,077.00 bi weekly | |
| Gayle Couleas | Nurse Practitioner | 50.00 per hour/ 60.00 per home visit | |
| Danielle Augustine | Medical Assistant | 20.00 per hour | N/A |
| Kimberly Walsh | Medical Assistant | 15.00 per hour | N/A |
| Kimberly Szollosi | Medical Assistant | 14.00 per hour | N/A |
| Merice German | Medical Assistant | 13.00 per hour | N/A |
| Ashlyn Verdi | Reception Manager | 16.00 per hour | N/A |
| Angelica Strippoli | Receptionist | 15.00 per hour | N/A |
| Courtney Staib | Receptionist/Authorization | 16.00 per hour | N/A |
| Jennifer Costa | Nutritional Consultant | 20.00 per hour/ 10.00 per consult fee | N/A |
| Frank Carfora | Office Assistant | 1,100.00 bi weekly | |
| Renee Sarnelli | Office Manager | 1,576.92 bi weekly | |
| Dr. Roxanne Carfora | Owner/Doctor | | |

**Schedule 5.29(b)**

**Compensation/Bonus Policy; Copies of all written agreements.**

The Seller pays employees every other Friday, with the exception of Dr. Carfora, who is paid on the 1st and 15th of each month.  The Seller does not give bonuses to its employees.

There are no written agreements, including all amendments thereto, with all officers, employees, consultants, independent contractors and any others who provide goods, services or the like to the Business, as of the Closing Date.

## Schedule 5.29(c)

None.

**Section 5.35**

| Policy Type | Insured | Insurer | Policy Number | Term |
|---|---|---|---|---|
| Physicians' Prof Liability | Roxanne Gail Carfora, DO, PC | Doctors and Surgeons National RRG | 15-010460-04 | 10/28/2015 – 10/28/2016 |
| Disability Insurance | Roxanne G. Carfora DO PC | ShelterPoint Life Insurance Company | DBL467723 | 06/05/2015 – 06/04/2016 |
| Workers' Compensation | Carfora Family Medicine | The Hartford | 02 WEC CQ0397 | 03/14/15 – 03/14/16 |
| Office Liability | Roxanne Gail Carfora DO PC | State Farm Insurance | | 12/01/15-12/01/16 |
| Medical Insurance | Roxanne Gail Carfora DO PC | Office Health Insurance | RG9375 | 04/01/14-04/01/16 |

**Schedule 5.36**

Owner owns the trademark "Ageless 360"

License to use software.

## Exhibit A

Bill of Sale

## BILL OF SALE

This Bill of Sale ("**Bill of Sale**") is executed and delivered as of [_____], by Roxanne Gail Carfora, D.O., P.C. d/b/a Ageless 360 Medical Group, a New York corporation (the "**Seller**"), to Long Island Practice Management LLC, a New York limited liability company ("**Purchaser**"), pursuant to the Asset Purchase Agreement, dated as of December 16, 2015, by an between the Seller and the Purchaser (the "**Agreement**").

**WHEREAS**, on the terms and subject to the conditions set forth in the Agreement, the Seller has agreed to sell, convey, assign, transfer and deliver to the Purchaser, and Purchaser has agreed to purchase and acquire from the Seller, the Acquired Assets (as defined in the Agreement); and

**WHEREAS**, the Agreement requires that the Seller execute and deliver to the Purchaser this Bill of Sale at the Closing.

**NOW, THEREFORE**, in consideration for the premises and other good and valuable consideration, the receipt and sufficiency of which a hereby acknowledged, the Seller and the Purchaser hereby agree as follows:

1.    <u>Defined Terms</u>. Capitalized terms used but not defined in this Bill of Sale have the meanings ascribed to them in the Agreement.

2.    <u>Transfer of the Assets</u>. The Seller hereby sells, conveys, assigns, transfers and delivers to the Purchaser the Acquired Assets, free and clear of all Claims and Encumbrances.

3.    <u>Purchase and Sale</u>. This Bill of Sale shall inure to the benefit of and be binding upon the parties hereto and their respective successors and assigns.

4.    <u>Governing Law</u>. This Bill of Sale shall be governed by, and be construed in accordance with, the laws of the State of New York (other than the choice of law principles thereof).

[remainder of page intentionally blank]

**IN WITNESS THEREOF**, the Seller has caused the undersigned duly authorized officer to execute this Bill of Sale as of the date and year first written above.

ROXANNE GAIL CARFORA, D.O., P.C.

By: _____
Name: Dr. Roxanne G. Carfora
Title: Owner

**<u>Exhibit B</u>**

Employment Agreement

Re:    Employment by Heart and Health Medical


Dear Dr. Roxanne Carfora:


This Letter Agreement ("Agreement") sets forth the terms and conditions of your employment by Heart and Health Medical (the "Practice") as a duly licensed physician in the specialty of family medicine. When countersigned by you, this Agreement shall constitute your Employment Agreement. The Practice and you shall sometimes individually be referred to as a "party" and collectively as the "parties."


**1.    <u>Employment and Term.</u>**

You are hereby employed by the Practice as an employee on a full time basis, commencing on the Closing Date of an asset purchase agreement between affiliates of the parties dated  January 7, 2015 (the "Effective Date"), for a term of two years (the "Initial Term"), unless earlier terminated as hereinafter provided.  This Agreement shall automatically renew for successive periods of one (1) year each (each a "Renewal Term") unless (i) either party gives the other party advance written notice of termination at least sixty (60) days prior to the end of any such one-year term; or (ii) this Agreement is terminated sooner in accordance with its terms.  The Initial Term and any Renewal Term of this Agreement shall hereinafter be referred to as the "Employment Period."


**2.    <u>Compensation.</u>**

The Practice agrees to pay you compensation and benefits as set forth on Schedule 1, attached to this Agreement.  The amounts payable pursuant to this Paragraph 2 shall constitute the sole and exclusive compensation for your services during the term of this Agreement.  Compensation shall be subject to the customary withholding taxes and other employment taxes, withholdings and deductions as required with respect to compensation paid by the Practice to an employee.

3.      **<u>Duties and Services</u>.**

(a)      You agree to provide medical services (the "Services") to patients of the Practice to the best of your ability in the offices of the Practice, located at 694 Motor parkway Hauppauge NY  11788 and 1070 Old Country Rd Plainview, NY 11803 (the "Office") and at such other office locations which may hereafter be maintained by the Practice, as the Practice may direct.

(b)      You agrees to: serve the Practice faithfully and to the best of your ability, provide such professional services as are required by the Practice; and devote  your time and attention to the business of the Practice. You agree to furnish at least 40 hours per week to the provision of the services pursuant to this Agreement.  You further agree that your schedule may change from time to time in accordance with the needs of the Practice.

(c)      Any vacation taken by you will be scheduled thirty (30) days in advance with the Practice to allow the Practice adequate time to make alternative arrangements for patient care.

(d)      You shall also perform such other duties as the Practice may from time to time reasonably direct, including "on duty" and all "on call" assignments at night and on weekends and holidays and at other times as the Practice may determine in its sole discretion.

(e)      You and the Practice acknowledge that the Practice may engage additional staff to assist you with the provision of the Services at the Office.  You and the Practice agree that the hiring of any and all staff to provide services at the Office must be approved and undertaken by a managing partner of the Practice.  In the event the Practice engages additional staff to assist with the provision of the Services, you shall be responsible for the supervision of such staff.

(f)      You agree to observe and comply with federal, state and local laws, rules and regulations applicable to your practice of medicine as well as with all rules, policies and procedures of the Practice, with respect to the performance of your duties, including, but not limited to, the Practice's policies regarding compliance with patient privacy and confidentiality under the Health Insurance Portability and Accountability Act.  You further agree to carry out and to perform orders, directions and policies stated

by the Practice from time to time, either orally or in writing, in conformity with accepted standards of professional ethics and practice.

(g)    You agree to perform documentation and charting of patient care services and issue all reports in a timely manner and in compliance with all applicable rules and regulations, including appropriate documentation required by any managed care facility such as a health maintenance organization, preferred provider organization and/or similar such entity, and good medical practice. Furthermore, it is agreed that all such charts and professional records, and all contracts with hospitals, health facilities, PPOs, HMOs, IPAs etc are the property of the Practice and that upon the termination of this Agreement, you shall not be entitled to receive any patient charts, or professional records or contracts with hospitals or health facilities obtained by the Practice.

(h)    All fees for professional services rendered by you as an employee of the Practice and all other remuneration received by you or the Practice for medically-oriented activities performed by you on behalf of the Practice shall be the property of the Practice, and you shall pay over such fees, salaries, payments or other remuneration to the Practice whether the same are collected during the Employment Period or after the termination thereof, unless otherwise agreed in writing by the Practice.  You hereby authorize the Practice to endorse checks payable to you for professional fees for your Services rendered hereunder.  You agree that you shall deliver to the Practice all Explanation of Benefit forms and other documentation or correspondence that may be sent to you with respect to the Services rendered by you on behalf of the Practice to patients of the Practice, whether such forms are delivered to you, the Practice or a third party.     In the event that you receive any checks or compensation for services rendered by or on behalf of the Practice or the Practice receives any checks or compensation for services rendered by you on your own behalf or on behalf of a third party in accordance with the terms of this Agreement, the party who is in receipt of such check or compensation (the "Recipient") acknowledges that it shall belong to the other party and the Recipient shall deliver such monies to the other party within ten (10) business days of the Recipient's receipt or discovery of such check or compensation.

(i)    You agree to the performance of all things reasonably desirable to maintain and improve your professional skills.

3

(j)     You shall have no authority to enter into any contracts binding upon the Practice, or to create any obligation on the part of the Practice except such as shall be specifically authorized by the Practice.

(k)     You shall maintain privileges at any hospital or facility as directed by the Practice.

**4.     <u>Insurance/Indemnification</u>.**

Throughout the Employment Period, you shall maintain, at the Practice's expense, a claims made medical malpractice insurance, in the minimum annual coverage limits of one million three hundred thousand ($1,300,000) dollars per occurrence and three million nine hundred thousand ($3,900,000) dollars in the aggregate from a carrier licensed in New York State.  Upon execution of this Agreement, you shall promptly make all appropriate arrangements to obtain such malpractice insurance, shall provide the Practice with evidence of such malpractice insurance policy, and such insurance policy shall name the Practice as an additional insured and provide for thirty (30) days advance written notice by the carrier to the Practice in the event of any reduction, termination or cancellation of your insurance coverage.  In the event that such insurance is with a carrier other that PRI and such carrier will not name the Practice as an additional insured, then all costs incurred by the Practice in upgrading coverage to insure that the Practice is covered for your acts and omissions will be deemed an expense of the Practice before your compensation is calculated.  Further, wish respect to such claims-made insurance policy, you agree to: (a) continue such insurance policy in effect at your expense following termination or expiration of your employment with the Practice for so long a period in order to ensure that you and the Practice are covered for services rendered in accordance with this Agreement, or (b) purchase at your expense "tail" coverage to protect you and the Practice in connection with any claim that may be made following termination or expiration of your malpractice insurance arising from any act or omission that occurred prior thereto.  You agree to provide the Practice with evidence of such malpractice coverage and tail coverage upon its acquisition.  This Paragraph 4 shall survive the cancellation, termination or expiration of this Agreement.  You hereby represent and warrant to the Practice that while you were engaged in the practice of medicine at all times prior to commencement of your employment hereunder, you maintained medical malpractice liability insurance on an occurrence basis through Physicians Reciprocal Insurance Company.

In the event that you shall utilize your own car in a manner in any way related to the Practice, you shall in your sole expense obtain (and furnish a copy thereof to the Practice) automobile liability insurance issued by an insurance company satisfactory to the Practice, with coverage of not less than $100,000.00/$300,000.00.

You shall indemnify, defend, and hold harmless the Practice and each of its officers, directors, shareholders, agents and employees and their respective heirs, successors, administrators and assigns (collectively, the "Practice Indemnitees") from and against any and all claims, demands, losses, liabilities, actions, lawsuits and other proceedings, judgments and awards, and costs and expenses (including court costs, reasonable attorneys' and consultancy fees), arising, directly or indirectly, in whole or in part, out of any breach by you under this Agreement or any representations made by you in this Agreement, or any willful or negligent act or omission by you with respect to your performance of this Agreement, to the extent that such is not paid or covered by the proceeds of insurance. You shall promptly notify the Practice of any lawsuits or actions, or any threat thereof, against you and/or the Practice that may become known to you.

5.    **Employer's Authority.**

(a)    You understand and agree that the Practice shall be solely responsible for all billing and collection with respect to all Services provided by you to patients of the Practice under this Agreement. The Practice may elect, in its discretion to utilize the Services of a billing company, with respect to billing and collection for your Services hereunder.

(b)    You specifically understand and agree that the Practice shall have complete authority with respect to the acceptance of, or the refusal to treat or provide services to, any patient; and that the Practice shall have the exclusive authority to determine the fees and procedures for establishing the fees to be charged to patients of the Practice, even though such patients may be treated by you in the course of your employment by the Practice.

(c)    You agree that (i) all sums paid by or on behalf of any patient of the Practice by way of fees or otherwise for Services rendered by you hereunder are and will remain the property of the Practice whether collected before or following the termination or expiration of your employment by the Practice; (ii) the Practice is authorized to accept or refuse to accept, on its and/or your behalf,

participation in, and/or assignment of, insurance benefits from any patient receiving Services from you; (iii) this Agreement constitutes an assignment by you to the Practice of all funds owing or collected for Services rendered by you hereunder whether from patients or third-party payers, including Medicare; (iv) you shall take all additional steps as necessary and as reasonably requested by the Practice to assist the Practice in the billing and collection of fees due for Services rendered by you; and (v) you shall promptly pay over to the Practice all payments received by you for Services rendered by you under this Agreement.

(d)    At the request of the Practice, you shall (i) apply to and participate in any medical insurance, third party payor programs, managed care plans and health maintenance organizations ("Third-Party Payor Programs") designated by the Practice; (ii) complete in a timely manner such applications and execute such documents as may be requested by any of the Third-Party Payor Programs incident to your participation; and (iii) list and designate with such insurance or other Third-Party Payor Program the address of the Practice as the address to which all payments or payment voucher(s) for Services performed by you on behalf of the Practice shall be mailed.  You hereby authorize the Practice, at its election, to bill for the Services performed by you on behalf of the Practice hereunder under your name and billing numbers or under the name and billing numbers assigned to the Practice, as appropriate.

(e)    You hereby expressly agree and covenant that the compensation received by you under this Agreement shall satisfy and discharge in full all claims you may have against the Practice for compensation for your Services, provided such compensation is paid in accordance with the terms of this Agreement. You acknowledge that Services to the Practice in no way confer upon you an ownership interest in or personal claim upon any fees charged by the Practice for your Services, whether the same are collected during your employment or after the termination thereof, and you hereby disclaim and renounce any such interest or claim.

(f)    You agree to execute in a timely manner any and all forms and documents so that the Practice may bill and collect from patients and third party payors, including the Medicare Program, for the Services you render on behalf of the Practice, including without limitation, execution of any assignment of benefits forms or limited power of attorney forms including but not limited to those forms set forth in Exhibit A and B annexed hereto.

**6.**     **Records.**

During the Employment Period and after the termination or expiration thereof, you shall not be entitled to keep, preserve or duplicate records or charts of the Practice as to any patient or the business of the Practice, except that if a patient shall specifically request in writing that a copy of his/her records be made available to you, the Practice shall make available to you a copy of such record at your expense or the expense of the patient, with the originals retained by the Practice.  Notwithstanding the foregoing, you shall have the right to review and receive a copy of the medical record of a patient of the Practice whom you have treated pursuant to this Agreement, subject to applicable law, rules and regulations, in the event of any claims by a patient or investigation by a third party or audits by a third party.  The terms of this Paragraph 6 shall survive the expiration or termination of this Agreement.

**7.**     **Mail.**

You hereby agree that any and all mail and other correspondence addressed to you, which arose out of the employment hereunder, shall belong to and is hereby assigned to the Practice, whether said mail and correspondence is received during or subsequent to the termination of employment.

You shall not, at any time during nor subsequent to the termination of your employment, divert nor attempt to divert any such mail and/or other correspondence from the Practice.

You hereby authorize the Practice to open any mail addressed to you arising out of or by reason of the employment hereunder and hereby authorize the Practice to endorse and deposit in its account any checks made payable to you for any services rendered by you on behalf of the Practice.

**8.**     **Representations and Warranties of Employee.**

You hereby represent and warrant to the Practice that the following are true and will continue to be true as a continuing condition for your employment hereunder:

a) You are  duly licensed and registered to practice medicine in the State of New York with a specialty in the Specialty;

b) You are board eligible to practice the Specialty by the relevant national body

c) You are a member in good standing of the medical staff at all hospitals at which the Practice provides services and will maintain all such memberships throughout the terms of this Agreement;

d) You are a certified provider in the Medicare program;

e) You are under no contractual or other restriction or obligation which is inconsistent with the execution of this Agreement, the performance of  his duties hereunder, or the rights granted to the Practice hereunder;

f) You are under no physical or mental disability that would hinder  his performance of the professional duties to be rendered under this Agreement;

g) Except as set forth on Exhibit __hereto, you are not a party to any civil, criminal or administrative suit or proceeding, and is unaware of any threatened actions of such a nature;

h) You have conducted  your professional activities in accordance with all applicable Federal, state and city laws and regulations;

i) You will promptly disclose to the Practice: (i) the existence and basis of any proceedings against him that are instituted in any jurisdiction by any plaintiff, governmental agency, health care facility, peer review organization or professional society which involves any allegation of substandard care or professional misconduct; and (ii) any allegation of substandard care or professional misconduct raised against you by any person or agency during the term of this Agreement;

j) You possesses knowledge and skill in the Specialty comparable to other physicians practicing the Specialty in the geographic area serviced by the Practice;

k) You shall complete, in a timely manner, adequate, legible and proper medical records with respect to all services rendered to patients pursuant to this Agreement;

l) You shall participate in such commercial insurance programs, health maintenance organizations, managed care plans, independent practice associations, preferred provider organizations, and other such healthcare delivery systems with which the Practice may contract or affiliate;

m) You shall complete, in a timely manner, adequate and legible time sheets and other documents necessary for the Practice to compensate you and to obtain reimbursement for the services provided by you under this Agreement;

n) You have current controlled substance registrations issued by the New York Department of Health and the United States Drug Enforcement Administration, which registrations have not been surrendered, suspended, revoked or restricted in any manner, nor are there any proceedings pending which could restrict such registrations in any manner;

o) In connection with the provision of services pursuant to this Agreement, you shall use the Company's equipment, instruments, pharmaceuticals and supplies for the purpose for which they are intended and in a manner consistent with sound medical practice; and you will notify the Practice immediately if any of the foregoing shall become, in any manner, untrue.

(a) you (i) are licensed and registered to practice medicine in the State of New York; (ii) have a current, valid Drug Enforcement Agency ("DEA") Certificate; and (iii) have never been excluded, terminated or suspended from any state or federally funded health care program; (b) your license to practice medicine in New York is not encumbered or restricted in any way as a result of any disciplinary action taken against you by any government agency or board or otherwise; (c) you are board  eligible  in family medicine. (d) you are capable of performing the essential functions of your duties under this Agreement with or without a reasonable accommodation; (e) you are under no contractual or other restriction or obligation which is inconsistent with the execution of this Agreement or the performance of your duties hereunder.

9. **Representations and Warranties of the Practice**

The Practice represents and warrants to you that (i) it is a validly existing limited liability corporation organized pursuant to the laws of the State of New York, and (ii) it has full power and authority to enter into this Agreement and the signatory herein has the authority to enter into this Agreement and bind the Practice.

10. **Termination.**

(a)    Your employment with the Practice may be terminated at any time, **FOR CAUSE** by the Practice upon sixty (60) days' prior written notice to you.

(b)    Your employment by the Practice may be terminated at any time upon the mutual agreement of the parties to terminate this Agreement in writing.

(c)    The Practice shall have the right to terminate your employment hereunder immediately upon the occurrence of any one of the following "for cause" events:

(i)    Your material breach of this Agreement or your failure or refusal to fulfill your duties and obligations pursuant to this Agreement, upon written notice to you from the Practice, provided such material breach has not been cured within fifteen (15) days of written notice of such breach by the Practice to you so long as such breach is susceptible to cure;

(ii)     Surrender, suspension, revocation, termination or other interruption or restriction of (A) your license to practice medicine; (B) your participation in the Medicare Program; or (C) your DEA certification; (D) your board certification ;

(iii)    Your being formally charged with a material violation by you of any statute, rule or regulation of any governmental or public body asserting jurisdiction over you in connection with the practice of medicine, or your conviction of a felony

(iv)    Physician fails to obtain medical staff privileges at any hospital where the Practice  provides services or  his medical staff privileges at any hospital are suspended (except if such suspension is imposed temporarily in order to complete medical records), terminated, or not renewed so that he loses the right to practice medicine at such hospital;

(v)     You is suspended or terminated from or otherwise not permitted to continue as a provider in the Medicare programs;

(vi)    You are suspended, terminated or expelled by any professional medical organization (other than for non-payment of dues), or he resigns from any professional organization under threat of disciplinary action;

(vii)   You are inattentive to, or neglectful of, the duties to be performed by him hereunder (other than as a result of illness or accident);

(viii)  Your death or disability.  Disability shall be defined as Physician's inability to carry out  his obligations under this Agreement for a period in excess of thirty (30) consecutive days or for forty-five (45) or more days during any one hundred and twenty (120) day period;

(ix)    You fail or are unable to qualify for the professional liability insurance coverage required hereunder, or such coverage lapses for any reason (other than due to nonpayment by the Practice);

(x)     You provide, or attempts to provide, services while under the influence of alcohol, drugs, or other mood-altering substances (except as duly prescribed by a treating physician and taken in accordance with the prescription);

(xi)    You either fail to comply with the policies of the Practice  or directions and orders given by duly appointed officers of the Practice in connection with the Practice's practice, or engages in any conduct deemed by the Practice to be injurious to its best interests;

(xii)    Any incompetent, disloyal, dishonest or illegal action or omission by you

(xiii)    the Practice determines that Physician may have engaged in unprofessional conduct (as defined in New York's Education Law); or

(xiv)    other conduct which in the sole opinion of the Practice creates a threat to the health, safety or welfare of patients, demonstrates a failure to carry out Physician's responsibilities hereunder, or is otherwise contrary to the best interests and welfare of the Practice or its patients

.

## 11.    __Confidential Information__

You acknowledge that as a result of your employment with the Practice, you have and will necessarily become informed of, and have access to, certain valuable and confidential information regarding the Practice, the use or disclosure of which would or could cause irreparable injury to the Practice, including without limitation, patient lists and information, medical records, (collectively, the "Confidential Information"), and that the Confidential Information, even though it may be contributed, developed or acquired in whole or in part by you, is the Practice's exclusive property to be held by you in trust and solely for the Practice's benefit.  Accordingly, except as required by law, you shall not, at any time, either during or subsequent to the Employment Period, use, reveal, report, publish, copy, transcribe, transfer or otherwise disclose to any person, partnership, corporation or other entity, any of the Confidential Information without the prior written consent of the Practice, except to responsible officers and employees of the Practice and other responsible persons who are in a contractual or fiduciary relationship with the Practice.  The Confidential Information shall not include any information which legally and legitimately is or becomes of general public knowledge from authorized sources other than you.

## 12.    __Non-Solicitation and Restrictive Covenant.__

As you know, the main reason an affiliate of the Practice agreed to acquire the assets of your medical practice was the practice's patient list and the ability for the Practice to render medical care to those patients free from any competition or solicitation from you except for the benefit of the Practice. Thus, you agree that  in addition to and separable from the provisions contained above, you shall not: (i) knowingly, either directly or indirectly, for yourself or for any other person or company, call upon, solicit or induce, or attempt to solicit or induce in any manner whatsoever, any past or present employee, independent contractor, patient or referring physician or other referral source of the Practice to seek any professional medical services ; or (ii) take any action whatsoever which is likely to disturb or interfere, or in fact does disturb or interfere, with the existing contractual or other relationships which the Practice has with any patient, employee, independent contractor, hospital, managed care group or entity, referral source or other third party with respect to any professional medical services furnished by the Practice, and neither you nor any practice with which you are affiliated, shall employ or otherwise retain any such party associated with such employee, hospital, managed care group or entity, referral source or such other third party (as applicable).

You further agree that during the term of this agreement and for two (2) years thereafter, you will not either directly or indirectly engage in the practice of medicine within Five (5) miles of any office of the Practice. A violation by you of this Paragraph 12 shall include, without limitation, your practice individually, or as partner, employee, independent contractor, co-tenant, joint venturer, lessor, lessee, shareholder, associate, licensee, as part of a clinic or free-standing facility or salaried or attending staff position in a hospital, HMO, PPO or similar health care delivery system or entity.

## 13.    __Enforcement.__

You agree that the provisions of Paragraphs 11 and 12 are necessary and reasonable to protect the Practice in the performance of this Agreement, and that any breach or threatened breach may cause permanent and irreparable damage to the Practice for which a remedy at law will be inadequate.  If any restriction contained in Paragraphs 11 or 12 shall be deemed by any court of competent jurisdiction to be invalid, illegal, or unenforceable by reason of the extent, duration, or geographical scope thereof, or otherwise, then the parties agree that the restrictions contained in Paragraphs 11 and 12 shall nonetheless be enforceable to the fullest extent permitted by law, and the court shall make such adjustments in the

language of this Agreement as may be necessary to so enforce the provisions hereof.  In the event of any violation of the covenants set forth in Paragraphs 11 or 12, the Practice shall, without the requirement of posting a bond or other security, also be entitled to equitable relief, including specific performance, a temporary restraining order, preliminary injunction and permanent injunction.  Said monies shall be due and payable upon demand.  The remedies provided herein are cumulative and not exclusive.  Any election by the Practice to pursue less than all remedies provided shall not bar subsequent enforcement of any other remedies.

### 14.    <u>Notices.</u>

Notices or other communications required or permitted to be given hereunder shall be in writing, and shall be deemed duly given upon mailing by registered or certified mail, return receipt requested, or receipted overnight mail to all of the parties at their last known residence or principal office address.  A copy of each notice sent to the Practice shall be sent Heart and Health Medical 1350 Deer Park Ave North Babylon NY 11703, and a copy of each notice sent to you shall be sent to _____ _____ and Alber Law Group, LLP, 5036 Jericho Turnpike, Suite 305, Commack, New York 11725, Attention: Ronald T. Alber Jr., Esq..  Furthermore, in the event notice is sent to the Practice, a copy shall also be sent to:

### 15.    <u>Entire Agreement.</u>

This instrument contains the entire agreement of the parties.  It may not be changed orally, but only by an agreement in writing, signed by the party or parties against whom enforcement of any waiver, change, modification, extension or discharge is sought.

### 16.    <u>VENUE AND ACCEPTANCE OF SERVICE OF PROCESS.</u>

Each party to this Agreement hereby agrees and consents that any legal action or proceedings with respect to this Agreement shall only be brought in the courts of the State of New York, County of Nassau.  By execution and delivery of this Agreement,

each such party hereby (i) accepts the jurisdiction of the aforesaid courts; (ii) agrees to be bound by any judgment of any such court with respect to this Agreement; (iii) waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the venue set forth above; and (iv) further waives any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

At the option of any party bringing such action, proceeding or claim, service of legal process may be made upon any other party by transmitting a copy of such process by registered or certified mail, return receipt requested, postage prepaid, to such other party at the address set forth above.  Such mailing shall be deemed personal service and shall be legal and binding upon the party so served in any such action, proceeding or claim.

17.    **Return of Property.**

Upon expiration or termination of the Employment Period, you will immediately return to the Practice all the property of the Practice and Confidential Information in your possession.

18.    **Binding Effect.**

This Agreement shall be binding upon and inure to the benefit of the successors and permitted assigns of the Practice and your heirs, representatives and beneficiaries.  You acknowledge and agree that the Practice encouraged you to review this Agreement with legal counsel, that you had every opportunity to do so and that you chose not to have legal counsel review it.

19.    **Headings.**

Headings used in this Agreement are used for reference purposes only and do not affect the interpretation or meaning of this Agreement.

20.    **Governing Law.**

This Agreement shall be governed by and construed in accordance with the laws of the State of New York.

## 21. **Severability.**

The invalidity or unenforceability or any particular provision of this Agreement shall not affect the other provisions hereof, and the Agreement shall be construed in all respects as if such invalid or unenforceable provisions were omitted.

## 22. **No Assignment.**

You may not assign this Agreement or any of its/your rights (except for the assignment of your right to receive payment from payors for your Services hereunder which right is expressly assigned to the Practice) or obligations hereunder without the advance written approval of the other party.

## 23. **Entire Understanding**.

This Agreement sets forth the entire agreement and understanding between the parties as to the matters contained herein, and merges and supersedes all prior discussions, agreements, and understandings of every kind and nature among them; no party shall be bound by any condition, definition or representation other than as expressly provided for in this Agreement.

## 24. **Counterparts.**

This Agreement may be executed in counterparts and each such counterpart, when taken together, shall constitute a single and binding agreed

Kindly indicate your acceptance of the foregoing terms as set forth above by signing your name in the space below and returning to the undersigned.

Sincerely,

Heart and Health Medical

By: */s/ Dr. David Kavesteen*

Name: Dr. David Kavesteen, MD

Title: Member

AGREED TO AND ACCEPTED:


*/s/ Dr. Roxanne G. Carfora*

Date: December 16, 2015

**Schedule 1**

<u>Compensation and Benefits</u>
Effective the Effective Date

1.    <u>Compensation</u>:

In consideration for the Services rendered by you under this Agreement, the Practice shall pay you the following compensation:

(a)    An amount equal to $ 150000.00  per year to be paid biweekly for 40 H /Week.

2.    Benefits: You shall be eligible to claims made malpractice insurance at the Practice's expense. Furthermore, you shall be entitled to one (1) week of paid vacation for every four (4) months worked.  You shall also be entitled to one (1) week of paid vacation for CME completion per year after your first (1st) year of employment.

3.    Expenses: After your first (1st) year of employment, the Practice shall provide you with one thousand ($1000) dollars per year toward your CME requirements.

By: */s/ Dr. David Kavesteen*

Heart and Health Medical
By: David Kavesteen, MD
Title: Member

Agreed to and Accepted:

*/s/ Dr. Roxanne G. Carfora*
By: Dr. Roxanne G. Carfora

**EXHIBIT A**

      It is agreed that only Heart and Health Medical will bill and receive any and all fees or charges for the undersigned physician's services rendered during the term of this Agreement.

_____        _____

Date                                                                  _____, M.D.

## EXHIBIT B

## LIMITED POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS that _____, M.D. has made, constituted and appointed, and by these presents does make, constitute and appoint Heart and Health Medical  (the "PLLC"), having an address at 1070 Old Country Rd Plainview NY 11803, my true and lawful attorney for the limited purposes set forth below, and in my name, place and stead giving and granting unto said attorney full power and authority to do and perform all and every act and thing whatsoever requisite and necessary to be done in and about the premises, but solely with respect to the matters described below, as fully, to all intents and purposes, as I might or could do if personally present, with full power of substitution and revocation, hereby ratifying and confirming all that said attorney shall lawfully do or cause to be done by virtue hereof.

The purposes and matters to which this Limited Power of Attorney shall apply are: the billing, collection and retention of any and all amounts payable to me arising from my provision of services at or on behalf of the PLLC.

This instrument is irrevocable and may not be changed orally but only in writing with the consent of the PLLC.

IN WITNESS WHEREOF, I, _____, have hereunto set my hand the _____ day of _____, in the year 2016.

_____

, M.D.

STATE OF NEW YORK      )

                       ) ss.:

19

COUNTY OF SUFFOLK __ )

BE IT KNOWN, that, on the _____ day of _____, 2016 before me personally came _____, M.D., described above, and who executed the foregoing instrument, and (s)he acknowledged to me that he executed the same.

_____
Notary Public

**<u>Exhibit C</u>**

Sale Order

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

----------------------------------------------------------------x

In re                                              :          Chapter 11
                                                   :
ROXANNE GAIL CARFORA, D.O., P.C. d/b/a             :          Case No. 15-74328
AGELESS 360 MEDICAL GROUP, P.C.                    :
                                                   :
                          Debtor.                  :

----------------------------------------------------------------x

**ORDER AUTHORIZING AND APPROVING (I) THE ASSET PURCHASE
AGREEMENT SUBJECT TO HIGHER AND BETTER OFFERS, AND (II)(A)
APPROVING THE SALE OF CERTAIN ASSETS OF THE DEBTOR FREE AND
CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES, (B) AUTHORIZING THE
REJECTION OF CERTAIN UNEXPIRED LEASES AND EXECUTORY CONTRACTS,
AND (C) GRANTING RELATED RELIEF**

Upon the motion (the "Sale Motion")[1] of the above-captioned debtor (the "Debtor"),

pursuant to sections 105(a), 363 and 365 of title 11 of the United States Code (the "Bankruptcy

Code") and Federal Rules of Bankruptcy Procedure 2002, 6004, and 6006 (the "Bankruptcy

Rules"), for entry of an order authorizing and approving, among other things, (I) Approving The

Asset Purchase Agreement Subject To Higher And Better Offers, And (II)(A) Approving The

Sale Of Certain Assets Of The Debtor Free And Clear Of Liens, Claims, And Encumbrances to

Long Island Medical Practice LLC (the "Purchaser"), (B) Authorizing The Rejection Of Certain

Unexpired Leases And Executory Contracts, And (C) Granting Related Relief; and it appearing

that due and appropriate notice of the Sale Motion and the Sale Hearing having been given; and

it appearing that no other notice of the relief granted by this Order need be given; and the Court

having conducted a hearing on the Sale Motion on January 6, 2016 (the "Sale Hearing") at which

time all interested parties were offered an opportunity to be heard with respect to the Sale

Motion; and the Debtor having conducted a marketing process and published notice of the

---

[1] Capitalized terms not otherwise defined herein shall have the meanings given to them in the Motion or the APA.

proposed sale of its assets to Purchaser subject to higher and better offers (each offer a "Competing Offer") made by December 30, 2015, at 4:00 p.m. (the "Competing Offer Deadline"); and all objections to the Sale Motion made by December 30, 2015, at 4:00 (the "Objection Deadline") having been overruled or withdrawn; and the Debtor having determined that Purchaser has submitted the highest and best offer for the assets of the Debtor that Purchaser has offered to purchase (the "Acquired Assets") as more specifically described in the Asset Purchase Agreement (the "APA"); and all parties in interest having been heard, or having had the opportunity to be heard, regarding entry of this Order and approval of the sale of substantially all of the Debtor's assets to Purchaser and the rejection of certain contracts (the "Sale Transaction") and APA; and this Court being fully advised; this Court, based upon the arguments, testimony and evidence presented to it, hereby makes the following findings of fact and conclusions of law:

A.      This Court has jurisdiction to hear and determine the Sale Motion and to grant the relief requested in the Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue of this case and the Sale Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B.      This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).  To any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure as made applicable by Bankruptcy Rule 7054, this Court expressly finds that there is no just reason for delay in the implementation of this Order, and expressly directs entry of judgment as set forth herein.

C.      This proceeding is a "core proceeding" within the meaning of 28 U.S.C. § 157(b)(2)(A), (N) and (O).

D.      The statutory predicates for the Sale Motion are sections 105, 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, and 9014.

E.     As evidenced by the affidavits of service filed with the Court, and based upon the representations of counsel at the Sale Hearing, (i) proper, timely and adequate notice of the Sale Motion, the Sale Hearing, the Sale Transaction, the Competing Offer Deadline, and Objection Deadline, as approved herein has been provided in accordance with Bankruptcy Rules 2002, 6004, 6006, and 9014, (ii) such notice was good, sufficient and appropriate under the circumstances and (iii) no other or further notice of the Sale Motion, the Sale Hearing, the Sale Transaction, the Competing Offer Deadline, or the Objection Deadline as provided herein is necessary or shall be required.

F.     A reasonable opportunity to object or be heard with respect to the Sale Motion and the Sale Transaction has been afforded to all interested persons and entities, including, without limitation: (i) the Office of the United States Trustee for the Eastern District of New York; (ii) the attorneys for the Purchaser; (iii) all counterparties to the Rejected Contracts; (iv) all known persons holding a lien on any of the Acquired Assets; (v) all known creditors and all known parties in interest in this chapter 11 case, and (vi) all parties filing a notice of appearance in this case.

G.     Notice, as specified in the preceding paragraph and as evidenced by the affidavits of service filed with the Court, has been provided in the form and manner specified in the Sale Motion and such notice is reasonable and adequate.

H.     The Sale Transaction was conducted in a non-collusive, fair and good faith manner and a reasonable opportunity has been given to any interested party to make a higher and better offer for the Acquired Assets.

I.      Purchaser is purchasing the Acquired Assets in good faith and is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code, and is therefore entitled to the protection of that provision.

J.      The APA was negotiated, proposed and entered into by the Debtor and Purchaser without collusion, in good faith and from arms'-length bargaining positions.  Neither the Debtor nor Purchaser have engaged in any conduct that would cause or permit the Sale Transaction or any part of the transactions contemplated by the APA to be avoidable under section 363(n) of the Bankruptcy Code.

K.      As demonstrated by (i) the testimony and other evidence proffered or adduced at the Sale Hearing, and (ii) the representations of counsel made on the record at the Sale Hearing, the Debtor afforded interested potential purchasers a full and fair opportunity to submit a Competing Offer for the Acquired Assets.

L.      Purchaser is not an "insider" of any of the Debtor as that term is defined in section 101(31) of the Bankruptcy Code.

M.      The consideration provided by Purchaser for the Acquired Assets pursuant to the APA (i) is fair and reasonable, (ii) is the highest and best offer for the Acquired Assets, (iii) will provide a greater recovery for all of the Debtor's stakeholders than would be provided by any other practical available alternative and (iv) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Transfer Act and all other applicable laws.

N.      The Debtor has demonstrated a sufficient basis and compelling circumstances requiring the Debtor to enter into the APA and sell the Acquired Assets under section 363 of the

Bankruptcy Code, and such actions are appropriate exercises of the Debtor's business judgment and are in the best interests of the Debtor, the estate, and its creditors.

O.    The marketing process implemented by the Debtor and its advisors, as set forth in the Sale Motion, was fair, proper, and reasonably calculated to result in the best value received for the Acquired Assets.

P.    The Debtor has full authority and power to execute and deliver the APA and related agreements and all other documents contemplated by the APA, to perform its obligations therein and to consummate the Sale Transaction.  Except as set forth in the APA, no additional consents or approvals are necessary or required for the Debtor to enter into the APA, perform its obligations therein and consummate the Sale Transaction.

Q.    Purchaser would not have entered into the APA and would not consummate the Sale Transaction, thus adversely affecting the Debtor, the estate, and its creditors, if the Acquired Assets were not sold to it free and clear of all Claims and Encumbrances (defined below) or if Purchaser would, or in the future could, be liable for any Claims and Encumbrances against the Acquired Assets.

R.    Selling the Acquired Assets free and clear of any and all liens, claims (as defined in section 101(5) of the Bankruptcy Code), security interests, mortgages, encumbrances, obligations, including employee benefit obligations charges against or interests in property, adverse claims, claims of possession, rights of way, licenses, easements or restrictions of any kind, demands, guarantees, actions, suits, defenses, deposits, credits, allowances, options, rights, restrictions, limitations, contractual commitments, rights of first refusal, rights of setoff or recoupment, or interests of any kind or nature whether known or unknown, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or

unasserted, whether arising prior to or subsequent to the commencement of this chapter 11 case, whether imposed by agreement, understanding, law, equity or otherwise, subject to applicable law, including section 363 of the Bankruptcy Code (collectively, the "Claims and Encumbrances") would adversely impact the Debtor's estate, and the sale of the Acquired Assets other than as free and clear of all Claims and Encumbrances would be of substantially less value to the Debtor's estate.

S.      The provisions of section 363(f) of the Bankruptcy Code have been satisfied.  All holders of Claims and Encumbrances, if any, who did not object, or withdrew their objections to the Sale Transaction, are deemed to have consented to the Sale Transaction.

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED, EFFECTIVE IMMEDIATELY, AS FOLLOWS:**

1.      The relief requested in the Sale Motion is granted and approved in all respects, as set forth herein.  The Debtor's entry into the APA and the Sale Transaction is hereby approved in all respects.  Except as may be expressly provided herein, objections to the relief sought in the Sale Motion that have not been previously resolved or withdrawn are hereby overruled on their merits.

2.      The Debtor is authorized and directed to take any and all actions necessary or appropriate to (a) consummate the Sale Transaction in accordance with the Sale Motion, the APA and this Order, and (b) perform, consummate, implement and close fully the Sale Transaction, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the APA.

3.      Those holders of Claims and Encumbrances and other non-Debtor parties who did not object, or who withdrew their objections to entry of this Order, the Sale Motion, the Sale

Hearing, the Sale Transaction and the APA are deemed to have consented to this Order, the Sale Transaction and the APA pursuant to section 363(f)(2) of the Bankruptcy Code and are enjoined from taking any action against Purchaser, its successors, its assigns, its representatives, its affiliates, its properties, or any agent of the foregoing to recover any claim which such person or entity has against the Debtor or any of its affiliates or any of the Debtor's property.  Those holders of Claims and Encumbrances and other non-Debtor parties who did object, if any, fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are adequately protected by having their Claims and Encumbrances, if any, attach to the proceeds of the Sale Transaction ultimately attributable to the property against or in which they assert a Claim or Encumbrance.

**Sale and Transfer of the Acquired Assets**

4.    Upon Closing, the Acquired Assets transferred, sold and delivered to Purchaser shall be free and clear of all Claims and Encumbrances of any person or entity.  The transfer of the Acquired Assets to Purchaser constitutes a legal, valid and effective transfer of the Acquired Assets and shall vest Purchaser with all right, title and interest in and to the Acquired Assets.

5.    Upon closing of the Sale Transaction, this Order shall be construed as, and shall constitute for any and all purposes, a full and complete general assignment, conveyance and transfer of the Acquired Assets pursuant to the terms of the APA.

6.    Effective on the Closing, all entities, including, but not limited to, the Debtor, creditors, employees, former employees and shareholders, administrative agencies, tax and regulatory authorities, governmental departments, secretaries of state, federal, state and local officials, and their respective successors or assigns, including, but not limited to, persons asserting any Claims or Encumbrance against the Debtor's assets, shall be permanently and

forever barred, restrained and enjoined from commencing or continuing in any manner any action or other proceeding of any kind against the Acquired Assets or Purchaser (or its successors, assigns, agents or representatives) as alleged successor or otherwise with respect to any Claims and Encumbrances on or in respect of the Acquired Assets.

7.       Each and every term and provision of the APA, together with the terms and provisions of this Order, shall be binding in all respects upon all entities, including, but not limited to the Debtor, Purchaser, creditors, employees, former employees and shareholders, administrative agencies, governmental departments, secretaries of state, federal, state and local officials and their respective successors or assigns, including but not limited to persons asserting any Claim or Encumbrance against or interest in the Debtor's estate or the Debtor's assets, including any subsequent appointment of a trustee or other fiduciary under any section of the Bankruptcy Code.

8.       Upon the Closing, all entities holding Claims and Encumbrances of any kind and nature against the Debtor's assets hereby are barred from asserting such Claims and Encumbrances against Purchaser (or its successors, assigns, agents or representatives) and/or the Acquired Assets and, effective upon the transfer of the Acquired Assets to Purchaser upon Closing, the Claims and Encumbrances shall attach to the proceeds of the Sale Transaction with the same force, validity, priority and effect, if any, as against the Debtor's assets.

9.       This Order (a) is and shall be effective as a determination that, upon Closing, all Claims and Encumbrances existing as to the Debtor's assets conveyed to Purchaser have been and hereby are adjudged to be unconditionally released, discharged and terminated, with all such Claims and Encumbrances attaching automatically the proceeds in the same manner and priority, and (b) shall be binding upon and govern the acts of all entities, including all filing agents, filing

officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of

deeds, administrative agencies or units, governmental departments or units, secretaries of state,

federal, state and local officials and all other persons and entities who may be required by

operation of law, the duties of their office, or contract, to accept, file, register or otherwise record

or release any documents or instruments, or who may be required to report or insure any title or

state of title in or to any of the Debtor's assets conveyed to Purchaser.   All Claims and

Encumbrances of record as of the date of this Order shall be removed and stricken as against the

Acquired Assets in accordance with the foregoing.   All entities are authorized and specifically

directed to strike all such recorded Claims and Encumbrances against the Acquired Assets from

their records, official or otherwise.

10.     If any person or entity which has filed financing statements, mortgage, *lis pendens*

or other documents or agreements evidencing Claims and Encumbrances on the Acquired Assets

shall not have delivered to the Debtor prior to closing, in proper form for filing and executed by

the appropriate parties, termination statements, instruments of satisfaction, releases of liens and

easements and any other documents necessary for the purpose of documenting the release of all

Claims and Encumbrances which the person or entity has or may assert with respect to the

Acquired Assets, the Debtor is hereby authorized and directed upon closing, and Purchaser is

hereby authorized upon closing, to execute and file such statements, instruments, releases and

other documents on behalf of such person or entity with respect to the Acquired Assets.   Upon

closing of the Sale Transaction, each of the Debtor's creditors is authorized and directed to

execute such documents and take all such actions as may be necessary to release their respective

Claims and Encumbrances against the Acquired Assets.

11.    Upon closing, Purchaser (or its successors, assigns, agents or representatives) shall not be deemed to be (a) a successor to the Debtor, (b) *de facto* merged with the Debtor or (c) a mere continuation of the other Debtor.  Without limiting the generality of the foregoing, and except as specifically provided in the APA, Purchaser (or its successors, assigns, agents or representatives) shall not be liable for any claims against the Debtor or any of its predecessors or affiliates or assets, other than as expressly provided for in the APA or in this Order.

**Rejection of Contracts**

12.    At or before the Closing, Purchaser shall reject its executory and unexpired contracts (the "Contracts"), including its non-residential lease (the "Real Property Lease" together the "Rejected Contracts") for the premises located at 694 Motor Parkway.

13.    The effective date of rejection of the Rejected Contracts including the Real Property Lease shall be the Closing Date of the Sale Transaction.

**Additional Provisions**

14.    The provisions of this Order and the APA and any actions taken pursuant hereto or thereto shall survive entry of any order which may be entered (a) confirming or consummating any plan of reorganization of the Debtor, (b) converting the Debtor's case from chapter 11 to chapter 7, (c) dismissing the Debtor's bankruptcy case or (d) appointing a chapter 11 trustee or examiner, and the terms and provisions of the APA as well as the rights and interests granted pursuant to this Order and the APA shall continue in this or any superseding case and shall be binding upon the Debtor, Purchaser, and their respective successors and permitted assigns.

15.    Each and every federal, state, and governmental agency or department and any other person or entity is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA.

16.     Nothing contained in any order of any type or kind entered in this chapter 11 case or any related proceeding subsequent to entry of this Order, nor in any chapter 11 plan confirmed in this chapter 11 case, shall conflict with or derogate from the provisions of the APA or the terms of this Order.  Further, the provisions of this Order and any actions taken pursuant hereto shall survive the entry of an order confirming any plan of reorganization or liquidation for the Debtor, the conversion of the Debtor's case from chapter 11 to a case under chapter 7 of the Bankruptcy Code or the dismissal of the Debtor's bankruptcy case.  In any plan of reorganization or liquidation or otherwise, the Debtor shall not make any statement, take any position or take any act that supports an argument that Purchaser assumed debt that is not expressly assumed under the APA.

17.     To the extent, if any, anything contained in this Order conflicts with a provision in the APA, this Order shall govern and control.

18.     Purchaser is purchasing the Acquired Assets in good faith and is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code, and is therefore entitled to the protection of that provision.  The consideration provided by Purchaser for the Acquired Assets is fair and reasonable, and the Sale Transaction may not be avoided under section 363(n) of the Bankruptcy Code.

19.     This Court retains jurisdiction, even in the event of conversion of this chapter 11 case to a case under chapter 7, to (a) interpret, implement and enforce the terms and provisions of this Order (including any injunctive relief provided in this Order) and the terms of the APA, all amendments thereto and any waivers and consents thereunder and of each of the agreements executed in connection therewith; (b) protect Purchaser (and its successors, assigns, agents and representatives) and the Acquired Assets from and against any of the Claims and Encumbrances;

(c) resolve any disputes arising under or related to the APA or the Sale Transaction; (d) adjudicate all issues concerning (alleged) pre-Closing Claims and Encumbrances and any other (alleged) interest(s) in and to the Debtor's assets, including the extent, validity, enforceability, priority and nature of all such (alleged) Claims and Encumbrances and any other (alleged) interest(s); and (e) adjudicate any and all issues and/or disputes relating to the Debtor's right, title or interest in the Debtor's assets, the Motion and/or the APA.

20.     From and after the date hereof, the Debtor shall act in accordance with the terms of the APA and the Debtor, to the extent they have not already done so, shall execute the APA at or prior to Closing.

21.     This Order constitutes an authorization of conduct by the Debtor and nothing contained herein shall be deemed to constitute a ruling with regard to the sovereign immunity of any state.  The failure of any state to object to the entry of this Order shall not operate as a waiver with respect thereto.

22.     This Order and the APA shall be binding in all respects upon all creditors (whether known or unknown) of the Debtor, all successors and assigns of Purchaser, the Debtor and its affiliates and subsidiaries, the Debtor's assets, and any subsequent trustees appointed in the Debtor's chapter 11 case or in any chapter 7 case or upon (a) a conversion of this chapter 11 case to a case under chapter 7 or (b) dismissal of the Debtor's bankruptcy case.

23.     The failure specifically to include any particular provisions of the APA in this Order shall not diminish or impair the efficacy of such provisions, it being the intent of the Court that the APA and each and every provision, term and condition thereof be, and therefore is, authorized and approved in its entirety.

24.     The provisions of this Order are nonseverable and mutually dependent.

25.     The automatic stay of section 362(a) of the Bankruptcy Code shall not apply to and otherwise shall not prevent the exercise or performance by any party of its rights or obligations under the APA, including, without limitation, with respect to any cash held in escrow pursuant to the provisions thereof.

26.     This Sale Order shall take effect immediately and shall not be stayed pursuant to Bankruptcy Rules 6004(g), 6004(h), 6006(d), 7062, or otherwise.